## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ALISON SCULLY, Individually and on Behalf of All Others Similarly Situated,<br><br>                              Plaintiff,<br><br>       v.<br><br>GOLDMAN SACHS GROUP INC. and MORGAN STANLEY,<br><br>                              Defendants. | Case No. _____<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS**<br><br>DEMAND FOR JURY TRIAL |

Plaintiff Alison Scully ("Scully" or "Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys for Plaintiff's Complaint against Defendants Goldman Sachs Group Inc. ("Goldman Sachs") and Morgan Stanley ("Morgan Stanley") (collectively, "Defendants"), alleges the following based upon personal knowledge, as to Plaintiff and Plaintiff's own acts, and upon information and belief, as to all other matters, based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Goldman Sachs and Morgan Stanley press releases, Securities and Exchange Commission ("SEC") filings, analyst reports, media reports, and other publicly disclosed reports and information about the Defendants. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE AND SUMMARY OF THE ACTION

1.      This is a securities class action arising from the unlawful use of material non-public information by Defendants Goldman Sachs and Morgan Stanley, who collectively *avoided billions in losses* by selling shares of Baidu Inc. ("Baidu" or the "Company"), a Chinese multinational technology company specializing in Internet-related services and products and artificial intelligence, to Plaintiff and other unsuspecting and unwitting public shareholders, after

confidentiality learning that Archegos Capital Management ("Archegos"), a family office with $10 billion under management, failed (or was likely to fail) to meet a margin call, requiring it to fully liquidate its position in the Company.

2.      This action is brought on behalf of all those investors who purchased or otherwise acquired Baidu shares contemporaneously with Defendants' unlawful trades from March 22, 2021 through and including March 29, 2021 (the "Class Period"), pursuant to §§20A, 10(b), and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§78t-1, 78j(b), and 78t(a).

3.      As detailed below, Defendants sold a large amount of Baidu shares during the week of March 22, 2021 while in possession of material, non-public information.  According to subsequent media reports, Defendants unloaded large **block trades** consisting of shares of Archegos' doomed bets, including billions worth of Baidu securities, late Thursday, March 25, 2021, **before** the Archegos story reached the public, sending Baidu's stock into a complete tailspin, as illustrated by the stock chart below:



4.      As a result of these sales, Defendants **avoided billions in losses** combined.

5.      Defendants knew, or were reckless in not knowing, that they were prohibited from trading based on this confidential market-moving information, but traded anyway, disposing to Plaintiff and other members of the Class their Baidu stock before the news about Archegos was announced and Baidu's shares plummeted.

6.      As a result, Plaintiff and the Class have been damaged from Defendants' violations of U.S. securities laws.

## JURISDICTION AND VENUE

7.      The claims asserted herein arise under §§10(b), 20A, and 20(a) of the Exchange Act, 15 U.S.C. §§78j, 78t-1, and 78t(a).

8.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337, and §27 of the Exchange Act, 15 U.S.C. §78aa.

9.      Venue is proper in this District pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §1391(b).  Defendants Goldman Sachs and Morgan Stanley are both based in this District.

10.      In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the U.S. mail, interstate telephone communications, and facilities of the national securities exchange.

## PARTIES

11.     As set forth in the attached Certification, Plaintiff Scully acquired Baidu common stock during the Class Period and was damaged when the Inside Information[1] was publicly disclosed at the end of the Class Period, and the price of Baidu common shares declined as a result.

12.     Defendant Goldman Sachs is a global financial services institution.  Goldman Sachs served as one of Archegos' prime brokers, helping it make trades and lending it capital in the form of margin lending.  Goldman Sachs is incorporated under the laws of Delaware and maintains its headquarters at 200 West Street, New York, New York 10282.

13.     Defendant Morgan Stanley is a global financial services institution.  Morgan Stanley served as one of Archegos' prime brokers, helping it make trades and lending it capital in the form of margin lending.  Morgan Stanley is incorporated under the laws of Delaware and maintains its headquarters at 1585 Broadway, New York, New York 10036.

## SUBSTANTIVE ALLEGATIONS

### A.     Background on Archegos

14.     Archegos, a family office investment fund, was founded and run by Sung Kook (a.k.a. Bill) Hwang ("Hwang"), a former portfolio manager of Tiger Asia Management, a hedge fund he also founded.

15.     In 2012, Hwang pleaded guilty to insider trading and agreed to a $44 million SEC fine.  The SEC accused Hwang and his business of short-selling three Chinese bank stocks based on inside information—borrowing the shares, selling them high, and aiming to buy them back low and pocket the difference.  In addition, according to the SEC, Hwang also received private shares

---

[1]     "Inside Information" included, but is not limited to, the existence and contents of discussions between Hwang, Defendant Goldman Sachs, and Defendant Morgan Stanley, before the Class Period, which led Defendants to liquidate their positions in Baidu during the Class Period.

of stock at a significant discount from the market price, allowing him to profit in even further illicit ways.  Further, the SEC also said Hwang "attempted to manipulate the prices of publicly traded Chinese bank stocks in which Hwang's hedge funds had substantial short positions by placing losing trades in an attempt to lower the price of the stocks and increase the value of the short positions."  All of this enabled Hwang and his fund to collect more in management fees from their investors.

16.     Hwang launched the Archegos family office fund with $200 million in 2013.  By 2020, Hwang had grown the assets under management at Archegos to $10 billion.

17.     Archegos described itself as focused on public stocks in the U.S., China, Japan, South Korea, and Europe.  Its assets of approximately $10 billion included the likes of ViacomCBS Inc. ("ViacomCBS"), Discovery Inc., Farfetch Ltd., New York-listed Chinese tutoring company, GSX Techedu Inc., Tencent Music Entertainment Group, Vipshop Holdings Ltd., IQIYI Inc., and, of particular relevance here, Baidu.

18.     Archegos took big, concentrated positions in these companies through financial instruments called "total return swaps," whereby the underlying securities (stocks) are held by banks that broker the investments.  The swaps allow investors such as Archegos to bet on stock price moves, often with high levels of leverage, without owning the underlying securities.  Instead, banks buy and hold the stocks and give the fund a performance-related return.  The fund secures the trades by giving the bank collateral, such as cash or equities.

19.     These swaps also allow investors to take huge positions while posting limited funds up front, in essence borrowing from the bank, which, in turn, also enables investors the ability to maintain anonymity, even as Archegos, for example, was estimated to have had exposure to the economics of more than 10% of multiple companies' shares.  Since investors holding more than

10% of a company's securities are deemed to be company insiders and are subject to additional regulations around disclosures and profits, these swaps were particularly beneficial to Hwang.

20.     Moreover, Archegos utilized the leverage provided by its swaps strategy to gain exposure to more than $50 billion worth of securities.  Again, this strategy was designed in part to allow Hwang a means to avoid margin limits and regulatory disclosure requirements.

21.     Unbeknownst to investors and regulators, several large brokerage banks, including Defendants, each had simultaneously allowed Archegos to take on billions of dollars of exposure to volatile equities through swaps contracts, dramatically elevating the risk posed by these concentrated positions.

**B.     ViacomCBS's $3 Billion Stock Offering Served as Archegos' Achilles Heel**

22.     Hwang's swaps strategy began backfiring in March as the stock price of companies in which Archegos had significant exposure, including Baidu, which saw its shares dropping in value more than 20% from its February highs, and Farfetch, which experienced a 15% decline, began to sell off.

23.     However, it was a March 23, 2021 announcement by ViacomCBS that ultimately swept out the rug from under Archegos.  On that day, in what was perceived to be an effort to take advantage of its meteoric stock price rally, ViacomCBS announced a new $3 billion offering to help fund investments in its streaming service, Paramount+, which had launched earlier in the month.

24.     According to later reports citing people familiar with the matter, this announcement put significant stress on Archegos, since news of the deal sparked a slide in ViacomCBS share price, adding to Archegos's mounting losses.  In fact, according to the same report in *The Wall Street Journal* (published April 6, 2021), the fund had already started selling some of its position in ViacomCBS to try to offset losses, which only added pressure on the stock.

25.     On March 24, 2021, ViacomCBS priced that offering.  $20 million shares of its Class B common stock were going to be made available at $85 a share and 10 million shares of its 5.75% mandatory convertible preferred stock were going to be made available at $100 a share.  In addition, the underwriters, led by Defendants Morgan Stanley and Goldman Sachs (among others), were going to receive an option to purchase up to an additional three million Class B shares and up to an additional 1.5 million shares of mandatory convertible preferred stock.  All told, ViacomCBS expected to raise $3.06 billion if both options were exercised.

26.     Unfortunately, not all were convinced that ViacomCBS deserved such a lofty valuation.  For example, on March 25, 2021, one of Wall Street's most influential research firms, MoffettNathanson, published a report questioning the company's value, downgrading the stock to a "sell," and setting a price target of only $55 per share, compared to the company's $85 offer.  "We never, ever thought we would see Viacom[CBS] trading close to $100 per share," read the report, which was written by Michael Nathanson, a co-founder of the firm.  "Obviously, neither did ViacomCBS's management," it continued, citing the new stock offering.

27.     In the wake of that report, ViacomCBS's stock cratered, losing more than half its value in less than a week.  Indeed, by the close of trading on Friday, March 26, 2021, ViacomCBS was worth $48 per share.

28.     This proved to be extremely problematic for Archegos, which had traded ViacomCBS on margin (*i.e.*, with borrowed money).  Because Archegos had to maintain a certain amount of collateral to satisfy its lenders, and since the value of ViacomCBS stock drastically declined, Archegos needed enough collateral to cover, or else a margin call (where the lender can force a sell-off of the stock to bring the investor back into compliance with margin requirements), could be triggered.

29.     On March 27, 2021, it was reported that Archegos failed to cover and, as a result, had to liquidate more than $20 billion of its leveraged equity positions on Friday, March 26, 2021.

**C.      Defendants Avoid Losses from the Insider Trading**

30.     Archegos' fallout received wide media coverage in the days and weeks following the firm's remarkable liquidation for a number of reasons, including the fact that it dragged some of the world's most esteemed financial institutions into the mud alongside it.

31.     On March 26, 2021, Credit Suisse, for example, began liquidating billions of dollars worth of shares that Archegos had swap positions on, at fire sale prices.  By the time Credit Suisse tried to liquidate its own holdings of stocks underlying Archegos' sway contracts over the ensuing weekend, prices had already collapsed and Credit Suisse quickly racked up billions of dollars in losses.

32.     The same cannot be said for Defendants.  According to media reports, for example, Morgan Stanley sold *about $5 billion* in shares of Archegos' doomed bets late Thursday, March 25, *before* the Archegos story reached the public.  This revelation was captured in an article published on *CNBC.com*, on April 6, 2021, which stated in relevant part:

> The night before the Archegos Capital story burst into public view late last month, the fund's biggest prime broker *quietly unloaded some of its risky positions* to hedge funds, people with knowledge of the trades told CNBC.

> Morgan Stanley sold about $5 billion in shares from Archegos' doomed bets on U.S. media and Chinese tech names to a small group of hedge funds late Thursday, March 25, according to the people, who requested anonymity to speak frankly about the transaction.

> It's a previously unreported detail that shows the extraordinary steps some banks took to protect themselves from incurring losses from a client's meltdown.  The moves benefited Morgan Stanley, the world's biggest equities trading shop, and its shareholders.  While the bank escaped from the episode without material losses, other firms were less fortunate.  Credit Suisse said Tuesday that it took a $4.7 billion hit after unwinding losing Archegos positions; the firm also cut its dividend and halted share buybacks.

***Morgan Stanley had the consent of Archegos***, run by former Tiger Management analyst Bill Hwang, ***to shop around its stock late Thursday***, these people said.  The bank offered the shares at a discount, telling the hedge funds that they were part of a margin call that could prevent the collapse of an unnamed client.

But the investment bank had information it didn't share with the stock buyers: The basket of shares it was selling, comprised of eight or so names including Baidu and Tencent Music, was merely the opening salvo of an unprecedented wave of tens of billions of dollars in sales by Morgan Stanley and other investment banks starting the very next day.

Some of the clients felt betrayed by Morgan Stanley because they didn't receive that crucial context, according to one of the people familiar with the trades.  ***The hedge funds learned later in press reports that Hwang and his prime brokers convened Thursday night*** to attempt an orderly unwind of his positions, a difficult task considering the risk that word would get out.

That means that at least some bankers at Morgan Stanley knew the extent of the selling that was likely and that Hwang's firm was unlikely to be saved, these people contend.  That knowledge helped Morgan Stanley and rival Goldman Sachs avoid losses because the firms quickly disposed of shares tied to Archegos.  Morgan Stanley and Goldman declined to comment for this article.

Morgan Stanley was the biggest holder of the top ten stocks traded by Archegos at the end of 2020 with about $18 billion in positions overall, according to an analysis of filings by market participants.  Credit Suisse was the second most exposed with about $10 billion, these sources noted.  ***That means that Morgan Stanley could've faced roughly $10 billion in losses had it not acted quickly***.

"I think it was an 'oh s---' moment where Morgan was looking at potentially $10 billion in losses on their book alone, and they had to move risk fast," the person with knowledge said.

While Goldman's sale of $10.5 billion in Archegos-related stock on Friday, March 26 was widely reported after the bank blasted emails to a broad list of clients, Morgan Stanley's move the night before went unreported until now because the bank dealt with fewer than a half-dozen hedge funds, allowing the transactions to remain hidden.

The clients, a subgenre of hedge funds sometimes dubbed "equity capital markets strategies," typically don't have views on the merits of individual stocks.  Instead, they'll purchase blocks of stock from big prime brokers like Morgan Stanley and others when the discount is deep enough, usually to unwind the trades over time.

[Emphasis added].

33.     As a result of these sales, which were made with confidential, insider information, including that Baidu was among the few securities Archegos had to liquidate, Defendants Goldman Sachs and Morgan Stanley ***avoided billions in losses*** combined.

## CONTEMPORANEOUS PURCHASES

34.     Plaintiff purchased Baidu common stock contemporaneously (within the meaning of §20A of the Exchange Act, 15 U.S.C. §78t-1) with Defendants' sales of Baidu common stock.

## LOSS CAUSATION

35.     Defendants traded while in possession of material non-public information.  Later, when the information became publicly known, the price of Baidu common stock declined sharply as a result of such disclosure.

36.     As a result of their purchases of Baidu common stock during the Class Period, Plaintiff and the other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## CLASS ACTION ALLEGATIONS

37.     Plaintiff brings this action as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a Class consisting of all those who purchased or otherwise acquired Baidu common stock during the Class Period and were damaged thereby (the "Class").  Excluded from the Class are Defendants, the officers and directors of Goldman Sachs and Morgan Stanley, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

38.     The members of the Class are so numerous that joinder of all members is impracticable.  During the Class Period, Baidu common stock was actively traded on the New York Stock Exchange and millions of shares were issued and outstanding.  While the exact number of Class members is unknown to Plaintiff at this time, and can only be ascertained through

appropriate discovery, Plaintiff believes that there are thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Baidu, or its transfer agent, and may be notified of the pendency of this action by mail, using customary forms of notice that are commonly used in securities class actions.

39.     Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct.

40.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel that is competent and experienced in class action and securities litigation. Plaintiff has no interests antagonistic to, or in conflict with, the members of the Class.

41.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

        a.     whether the federal securities laws were violated by Defendants' acts as alleged herein;

        b.     whether Archegos supplied inside information to Defendants, including information Defendants had a duty not to act on, and whether Defendants disregarded that duty and traded Baidu shares while in possession of material non-public information concerning Baidu and/or Archegos;

        c.     whether the inside information was material; and

        d.     the amount by which Plaintiff and other members of the Class were damaged as compared to the amount Defendants avoided losing as a result of the securities law violations alleged herein.

42.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy, since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

43.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

a.     Defendants failed to disclose material non-public information during the Class Period;

b.     the omissions were material;

c.     Baidu common stock is traded in an efficient market;

d.     Baidu's shares were liquid and traded with moderate to heavy volume during the Class Period;

e.     Baidu shares were traded on the NYSE; and

f.     Plaintiff and other members of the Class purchased, acquired, and/or sold the applicable Baidu securities between the time Defendants failed to disclose material facts and traded thereon and the time the true facts were disclosed, without knowledge of the omitted facts.

44.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

## CLAIMS FOR RELIEF

### COUNT I
**Violations of §10(b) of the Exchange Act and
Rule 10b-5 Promulgated Thereunder
Against All Defendants**

45.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

46.     The information provided to Defendants Goldman Sachs and Morgan Stanley about Archegos' likely insolvency as a result of its inability to satisfy its lenders' margin calls, and, therefore, the forthcoming liquidation of specific securities, including Baidu shares, was material and non-public.  In addition, the information was, in each case, considered confidential by Archegos, which was the source of the information, and which provided said information for the purpose of obtaining assistance in liquidating its position in Baidu, not the positions of either Morgan Stanley or Goldman Sachs.

47.     Defendants obtained the material non-public information pursuant to their agreements with Archegos and as a result of their serving as prime brokers of Archegos.

48.     Defendants knew, recklessly disregarded, or should have known that they owed a fiduciary duty, or obligation arising from a similar relationship of trust and confidence, to Archegos to keep the information confidential.

49.     Nevertheless, while in possession of material, non-public adverse information, Defendants collectively sold billions of dollars' worth of Baidu shares.

50.     By virtue of the foregoing, all Defendants, and each of them, in connection with the purchase or sale of securities, by the use of the means of instrumentalities of interstate commerce, or of the mails, or a facility of a national securities exchange, directly or indirectly:

a.      employed devices, schemes, or artifices to defraud;

      b.      made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

      c.      engaged in acts, practices, or courses of business that operated, or would have operated, as a fraud or deceit upon persons.

51.     By virtue of the foregoing, all Defendants, and each of them, directly or indirectly, violated, and unless enjoined, will again violate, §10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 thereunder, 17 C.F.R. §240.10b-5.

52.     Plaintiff contemporaneously purchased and/or sold securities of the same class as those sold by Defendants Morgan Stanley and Goldman Sachs.

**COUNT II**
**Violations of §20A of the Exchange Act**
**(Against All Defendants)**

53.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

54.     This Claim is brought against all Defendants under §20A of the Exchange Act, 15 U.S.C. §78t-1.

55.     Defendants knew, recklessly disregarded, or should have known that they had received material, adverse non-public information and that they owed a fiduciary duty, or obligation arising from a similar relationship of trust and confidence, to Archegos to keep this information confidential.

56.     By virtue of the foregoing, all Defendants, and each of them, in connection with the purchase or sale of securities, by the use of the means of instrumentalities of interstate commerce, or of the mails, or a facility of a national securities exchange, directly or indirectly:

      a.      employed devices, schemes, or artifices to defraud;

14

b.     made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

c.     engaged in acts, practices, or courses of business that operated, or would have operated, as a fraud or deceit upon persons.

57.     By virtue of the foregoing, all Defendants, and each of them, directly or indirectly, violated, and unless enjoined, will again violate, §10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 thereunder, 17 C.F.R. §240.10b-5.

58.     By virtue of the foregoing, Defendants are jointly and severally liable to Plaintiff and the Class for their insider sales pursuant to §20A of the Exchange Act, 15 U.S.C. §78t-1.

59.     When the material adverse information was eventually revealed, Baidu's stock price declined and investors suffered economic loss, *i.e.*, damages.

### COUNT III
**Violations of §20(a) of the Exchange Act**
**(Against all Defendants)**

60.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

61.     This Claim is brought against all Defendants for control person liability under §20(a) of the Exchange Act.

62.     Pursuant to §20(a) of the Exchange Act:

Every person who, directly or indirectly, controls any person liable under any provisions of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable . . ., unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

63. Defendants did not act in good faith and directly and/or indirectly induced the wrongful acts complained of herein by:

      a. permitting the insider sales to occur with actual knowledge or reckless disregard for whether the entities trading possessed material non-public information; or

      b. failing to adequately supervise their own actions in connection with the acquisition of the inside information and trading thereon.

64. By virtue of the foregoing, the Defendants named in this count are jointly and severally liable, pursuant to §20(a) of the Exchange Act, to Plaintiff and the Class with the Defendants liable under the First Count above.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A. Declaring that the instant action may be maintained as a class action under Fed. R. Civ. P. 23 and certifying Plaintiff as the Class Representative;

B. Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the act and transactions alleged herein;

C. Awarding Plaintiff and the other members of the Class pre-judgment and post-judgment interest, as well as reasonable attorneys' fees, expert witness fees, and other costs and disbursements;

D. Ordering an accounting and disgorgement of Defendants' unjust profits; and

E. Awarding Plaintiff and the other members of the Class such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED:  December 16, 2021          **SCOTT+SCOTT ATTORNEYS AT LAW LLP**

   *s/ Thomas L. Laughlin, IV*
Thomas L. Laughlin, IV
Rhiana L. Swartz
Jonathan M. Zimmerman (*pro hac vice* forthcoming)
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: 212-223-6444
Facsimile:  212-223-6334
tlaughlin@scott-scott.com
rswartz@scott-scott.com
jzimmerman@scott-scott.com

**HEDIN HALL LLP**
David W. Hall
Armen Zohrabian
Arun Ravindran
Four Embarcadero Center, Suite 1400
San Francisco, CA  94104
Telephone: 415-766-3534
Facsimile:  415-402-0058
dhall@hedinhall.com
azohrabian@hedinhall.com
aravindran@hedinhall.com

**THE SCHALL LAW FIRM**
Brian J. Schall
1880 Century Park E, Suite 404
Los Angeles, CA 90067-1604
Telephone: 310-301-3335
Facsimile:  310-388-0192
brian@schallfirm.com

*Attorneys for Plaintiff Scully*