**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ALISON SCULLY , Individually and on Behalf of All Others Similarly Situated,<br><br>      Plaintiff,<br><br> v.<br><br>GOLDMAN SACHS GROUP INC. and MORGAN STANLEY,<br><br>      Defendants. | Case No. 1:21-cv-10791-PAC<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT**<br><br>DEMAND FOR JURY TRIAL |

THIS DOCUMENT RELATES TO:

   1:21-cv-08618-PAC
   1:21-cv-08752-PAC
   1:21-cv-08897-PAC
   1:21-cv-10286-PAC
   1:21-cv-08413-PAC
   1:22-cv-00169-PAC

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................ 1

JURISDICTION AND VENUE .................................................................................. 11

PARTIES .................................................................................................................... 12

SUBSTANTIVE ALLEGATIONS ............................................................................ 13

I.  DEFENDANTS' RELATIONSHIP WITH ARCHEGOS .................................... 13

    A.  Archegos, an Unregulated Family Office with a History of Illicit Trading, Depended on Its Prime Brokers, Including Defendants, to Provide It with Swaps and Margin ... 13

    B.  Defendants Agreed to Serve as Archegos's Prime Brokers, Despite Its Troubling History, and to Facilitate Its Manipulative Trading in Exchange for Substantial Fees .................................................................................................................... 19

    C.  Defendants' History of Tipping MNPI They Received from Investment Funds to Facilitate Front-Running ................................................................................... 22

II.  WITH DEFENDANTS' ASSISTANCE, ARCHEGOS DEVELOPED POSITIONS THAT MADE IT AN INSIDER IN BAIDU ALONG WITH SEVERAL OTHER SECURITIES, MANIPULATED THEIR PRICES, AND HID THIS FROM THE RELEVANT COMPANIES AND THE MARKET .................................................................... 27

    A.  In the Spring of 2020, Archegos Switched Its Investing "Strategy," and Concentrated Its Portfolio in Several Large, Highly Leveraged Positions of Mid-to-Small Cap Companies ........................................................................................................ 27

    B.  Archegos Hid Its Enormous Positions from the Market and Sought to Evade Disclosure Requirements by Entering TRS with Defendants and Other Prime Brokers ............................................................................................................. 31

    C.  Archegos Manipulated the Stock Prices of Its Top Positions with Defendants' Assistance ........................................................................................................ 35

III.  ARCHEGOS PROVIDED MNPI TO DEFENDANTS FOR A PERSONAL BENEFIT, AND ALSO WITH THE EXPECTATION THAT DEFENDANTS WOULD TRADE ON IT ................................................................................................................ 44

    A.  MNPI Defendants Received from Archegos ................................................ 44

    B.  Archegos Provided the MNPI to Defendants for Personal Benefit ............. 59

    C.  Archegos Also Expected Defendants to Trade on the MNPI ....................... 62

IV.  CONSISTENT WITH THEIR HISTORY OF INSIDER TRADING, DEFENDANTS TRADED ON THE MNPI HERE, FRONT-RUNNING THE MARKET AND SELLING THE RELEVANT SECURITIES BEFORE OTHERS LEARNED OF ARCHEGOS'S IMPENDING COLLAPSE ................................................................................... 63

    A.  Overview of Defendants' Holdings in the Issuers' Stocks Shortly Before and Archegos's Collapse ..................................................................................... 63

B.   Defendants' Sales of the Issuers' Stock in the Week Following March 22, 2021 ....... 66

C.   Summary of Defendants' Tipper/Tippee Insider Trading ........................................... 70

V.   DEFENDANTS ALSO MISAPPROPRIATED MNPI FROM ARCHEGOS, AND TIPPED PREFERRED CLIENTS ACHIEVING A "FADE" IN THE ISSUERS' STOCK PRICES ........................................................................................................ 74

VI.  THE FALLOUT FROM ARCHEGOS' COLLAPSE AND DEFENDANTS' INSIDER TRADING ............................................................................................................ 80

SCIENTER ........................................................................................................................ 89

LOSS CAUSATION ........................................................................................................... 93

RELIANCE ........................................................................................................................ 94

DEFENDANTS MORGAN STANLEY'S AND GOLDMAN SACHS'S UNLAWFUL LOSS AVOIDANCE ................................................................................................................... 95

CONTEMPORANEOUS PURCHASES AND SALES .................................................................. 95

CLASS ACTION ALLEGATIONS ......................................................................................... 96

CLAIMS FOR RELIEF ........................................................................................................ 98

PRAYER FOR RELIEF ...................................................................................................... 105

JURY TRIAL DEMANDED ................................................................................................ 106

Lead Plaintiff in Case No. 1:21-cv-10791-PAC Dr. Jeffrey Wachtel ("Lead Plaintiff"), individually and on behalf of a class of investors in Baidu, Inc. ("Baidu") securities (as further defined below, the "Baidu Investor Class") alleges the following based upon personal knowledge, as to himself and his own acts, and upon information and belief, as to all other matters. Such information and belief is based on, *inter alia*, the investigation conducted by and through Lead Plaintiff's attorneys in the above-captioned cases, which included, among other things, a review of Defendant Morgan Stanley ("Morgan Stanley") and Defendant Goldman Sachs Group, Inc. ("Goldman Sachs") press releases, filings from multiple cases, analyst reports, media reports, trading records, a report from Credit Suisse's Board of Directors Report on Archegos Capital Management, information provided by regulators and other publicly disclosed information. Lead Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## INTRODUCTION

1.      This is one of seven coordinated putative securities class actions (the "Archegos Cases"), arising out of the same illicit insider trading by Defendants Morgan Stanley and Goldman Sachs ahead of the March 2021 collapse of Archegos Capital Management, LP ("Archegos"). Plaintiffs allege that by late March 2021, Defendants Morgan Stanley and Goldman Sachs received material non-public information ("MNPI") from Archegos in the course of their confidential prime brokerage relationship. Most glaring, they learned that Archegos had engaged in a massive market manipulation scheme that was on the brink of collapse and that would certainly devastate the share price of the manipulated stocks. The scheme included Archegos taking control of several companies' stock through highly leveraged transactions, including swaps, that Defendants facilitated. Defendants Morgan Stanley and Goldman Sachs fully exploited their receipt of MNPI

by rushing to sell billions of dollars in the affected stocks before the market learned of the MNPI, including of Archegos's impending collapse.

2.      More specifically, Defendants Morgan Stanley and Goldman Sachs served as prime brokers for Archegos, servicing its trades and lending capital through margin accounts, acting as counterparties on derivative "total return swaps" ("TRS"), and thereby enabling Archegos to acquire large, non-public, controlling positions in each of the seven issuers that are the subject of the Archegos Cases - Gaotu Techedu Inc., formerly known as GSX Techedu Inc., ("Gaotu"), Vipshop Holdings Ltd. ("Vipshop"), Tencent Music Entertainment Group ("Tencent"), ViacomCBS, Inc. ("ViacomCBS"), IQIYI, Inc. ("IQIYI"), Baidu, Inc. ("Baidu"), and Discovery, Inc. ("Discovery"; collectively, the "Issuers"). Defendants received substantial fees for providing these services and facilitating Archegos's scheme, which they accepted despite being aware of that scheme, of the risk it posed overall and to specific transactions, and of Archegos's long history of illegal and manipulative trading.

3.      As Defendants Morgan Stanley and Goldman Sachs knew, Archegos's undisclosed controlling stake across the Issuers was enormous and concentrated – both in terms of the percentage of each Issuer's stock that Archegos controlled and of the percentage of Archegos's portfolio that these stakes comprised – as well as highly leveraged. Defendants also knew that the exposure and risk posed by Archegos's undisclosed positions had been exacerbated by their own non-public market-neutral hedging strategies, in which they acquired substantial amounts of their own proprietary hedged shares in the Issuers' stock, corresponding to Archegos's TRS, and that this exposure and risk had increased dramatically into and across the first months of 2021. Further, Defendants knew that none of this information or the other MNPI had been disclosed to the Issuers,

their shareholders or the market – Archegos had instead provided this MNPI exclusively to Defendants and several other prime brokers it was working with.

4.      An array of investigations, complaints and actions have since detailed how Archegos had built its undisclosed, massive, highly leveraged positions by means of tell-tale "market manipulation and fraud, with far-reaching consequences for other participants in the United States securities markets," particularly for Lead Plaintiff and other ordinary investors in the "companies whose stock prices [Archegos] manipulated," namely the Issuers.  That is, Archegos artificially inflated the price of the Issuers' stock by taking enormous positions in them, by trading a large percentage of their volume on a regular basis and through other manipulative tactics that investment firms typically do not employ.

5.      As indicated in the *Report on Archegos Capital Management* prepared by Credit Suisse, one of Archegos's other prime brokers, Defendants and other prime brokers were aware of numerous "red flags relating to the size, concentration, and liquidity of Archegos's portfolio."  The report further revealed that Defendants and other prime brokers knew that Archegos "had additional concentrated exposure to the same single-name positions [in the Issuers' stock] across the Street."  In fact, certain prime brokers agreed to give up the contractual provision whereby Archegos was required "to represent, in connection with any trade, that it did not hold beneficial ownership (whether in stock or through swaps) amounting to 10% of the outstanding shares of an issuer," and instead accepted that Archegos merely represent that it did not hold beneficial ownership amounting to 20% of the outstanding shares of an issuer, whereby Archegos effectively admitted that its ownership positions in the Issuers' stock greatly exceeded 20%.

6.      Based on those massive positions and control, Archegos was an insider of the Issuers and owed them corresponding duties, including to abstain from trading on or disclose the

MNPI. But Archegos never informed the Issuers or their shareholders of its controlling interests, the substantial risks to their stock prices from its manipulative scheme or other MNPI. Instead, in breach of its duties to the Issuers, Archegos provided that information exclusively to Defendants Morgan Stanley and Goldman Sachs as well as its handful of other prime brokers to facilitate its manipulative trading. Defendants thereby derivatively owed the same duties as Archegos to the Issuers and their shareholders.

7.     Defendants Morgan Stanley and Goldman Sachs further knew that Archegos received or anticipated receiving an array of personal benefits, direct or indirect, as a result of or in relation to its disclosure to Defendants of the MNPI at issue here. Archegos's market manipulation scheme depended on continued prime brokerage services and trading capacity from Defendants (and its other prime brokers), who also received substantial fees from Archegos for those services and who simply made it more expensive for Archegos to trade as its scheme became ever riskier, and who were receiving MNPI from Archegos on a regular and sometimes daily basis so that it could undertake additional transactions. Defendants could only continue to receive those outsized fees so long as Archegos's manipulation scheme continued as well. Not only did Archegos obtain direct financial benefits, which included the investment gains and losses avoided via the increases in the Issuers' stock prices, but it also gained reputational and other non-pecuniary benefits from having relationships with powerful institutions like Defendants, which were particularly valuable to Archegos given its history of illegal trading and convictions as it sought out additional prime brokerage capacity to enable its operations and market manipulation scheme. Moreover, as Archegos's market manipulation scheme became increasingly tenuous in late March 2021, Archegos attempted to employ its favorable relationships with Defendants to delay or avoid notices of default, to increase the likelihood of an organized winddown among its counterparties,

and otherwise delay or mitigate the negative financial, regulatory, and reputational fallout and consequences of its collapsing market manipulation scheme.

8.      None of the benefits that Archegos received from providing Defendants with MNPI held any advantage for the Issuers, whom the MNPI concerned – to the contrary, they all harmed the Issuers and their shareholders.  As such, the relationships between Archegos and Defendants Morgan Stanley and Goldman Sachs, as well as with its other prime brokers, bear the hallmarks of a *quid pro quo*, and of exclusivity and confidence.

9.      Critically, in late March 2021, Defendants Morgan Stanley and Goldman Sachs had learned from Archegos that its highly leveraged market manipulation scheme was about to collapse, with dire consequences for the Class members of the Archegos Cases, *i.e.,* ordinary public shareholders of the Issuers.  Over the previous months, as the Issuers' stock prices had come under pressure, the ballooning risk posed by Archegos's highly leveraged positions led Defendants to issue a series of escalating margin calls, demanding hundreds of millions of dollars in additional collateral from Archegos.  By the week of March 22, 2021, Archegos's ability to cover these margin calls was all but exhausted when further price declines across several of the Issuers' stocks exacerbated its exposure, leading Defendants Morgan Stanley and Goldman Sachs, and its other prime brokers, to demand billions of dollars more in collateral.  As it was already tapped out, Archegos informed Defendants, and its other prime brokers, that it did not have the liquidity to meet any of their margin calls.

10.      Archegos thus convened a series of calls with Defendants Morgan Stanley and Goldman Sachs, and its other prime brokers, exclusively informing them that while its equity had declined **to less than $10 billion**, its aggregate **exposure had ballooned to $120 billion**.  On these calls, Archegos also proposed that Defendants and its other prime brokers enter into a collective

standstill, hold off on triggering events of default, and allowing for an orderly liquidation of positions it controlled in the Issuers' stock, so as to achieve better prices on those sales. This occurred after Archegos had already asked Defendants to sell certain of its collateral in the Issuers' stock, and that had failed to raise sufficient capital for Archegos to satisfy its margin calls and other obligations to Defendants and its other prime brokers. Thus, Archegos expected or should have expected that Defendants would trade on the MNPI it provided them.

11.      In response, Defendants Morgan Stanley and Goldman Sachs, and other prime brokers, also held a series of calls and meetings discussing the possibility of a managed liquidation. Counsel for all the prime brokers, including Defendants, were engaged and attended these calls to work through regulatory and legal challenges, and those counsel also held calls among themselves, where they acknowledged, among other things, that no prime broker was permitted to disclose its Archegos-related positions as that information was confidential.

12.      But, at the same time, Defendants Morgan Stanley and Goldman Sachs were rushing to unload billions of dollars of their proprietary hedged shares of the Issuers' stock before the market learned of Archegos's collapse or the other MNPI. In fact, as news outlets reported and Defendants themselves admitted, the entire point of their rushed sales was to front run the market.

13.      These and other illicit insider sales allowed Defendants Morgan Stanley and Goldman Sachs to avoid billions in losses on the basis of MNPI related to Archegos's market manipulation scheme, undisclosed massive beneficial ownership stakes, inability to cover, and impending liquidation of the Issuers' stock. Indeed, other of Archegos's prime brokers that did not rush to make insider sales lost billions of dollars on their Archegos-related positions.

14.     The ensuing fallout caused severe harm to ordinary investors.  When the MNPI was publicly revealed that Archegos was collapsing, that it controlled enormous positions in the Issuers' stock, and that its prime brokers were liquidating those positions, the artificially inflated market prices for the Issuers' stock collapsed, causing over $100 billion in market losses to Lead Plaintiff and other ordinary public shareholders who traded contemporaneously with Defendants Morgan Stanley and Goldman Sachs.

15.     The fallout did not end there.  Over the months since, a firehose of public reports revealed multiple civil and criminal investigations into Archegos and its prime brokers, including a probe targeting the block trading and other Archegos-related activity of Defendants Morgan Stanley and Goldman Sachs that was accelerated following Archegos's collapse.  Public reports have named particular employees of Defendants and their preferred hedge fund clients implicated in the underlying front-running misconduct alleged in the Archegos Cases.  They include Pawan Passi ("Passi"), the long-time head of Defendant Morgan Stanley's block trading business, who was placed on leave in November 2021 amid regulatory investigations into his possible tipping of Defendant Morgan Stanley's hedge fund clients – such as Surveyor Capital, Element Capital Management, CaaS Capital Management, and Islet Management – ahead of Archegos-related block trades.  Other bankers swept up in these investigations include Michael Daum of Defendant Goldman Sachs, Michael Lewis, formerly of Defendant Morgan Stanley, and Felipe Portillo of Credit Suisse.  Reports later surfaced that Passi had been formally replaced at Defendant Morgan Stanley and may be cooperating with government investigators, and that Defendants Morgan Stanley and Goldman Sachs are pursuing quick settlements with Archegos in an effort to keep as-of-yet non-public facts out of reach from the U.S. Department of Justice ("DOJ") and other

government and private investigators and litigants.  Defendant Morgan Stanley is also seeking to resolve the government investigation into its block trading.

16.    This particular action is brought on behalf of all persons who purchased or otherwise acquired Baidu shares contemporaneously with Defendants' unlawful trades from March 22, 2021 through and including March 29, 2021 (the "Class Period"), pursuant to §§20A, 10(b), and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§78t-1, 78j(b), and 78t(a).  As detailed below, Defendants Morgan Stanley and Goldman Sachs sold a large amount of Baidu shares during the week of March 22, 2021 while in possession of MNPI. Defendants' illicit insider sales were part of a manipulative and deceptive device, scheme, and artifice to defraud that operated as a fraud and deceit by means of Defendants' directly trading in the securities of Baidu while in possession of MNPI obtained from Archegos and in breach of duties owed both to the shareholders of Baidu and Archegos.

17.    The MNPI that Defendants Morgan Stanley and Goldman Sachs possessed while trading in breach of their duties owed to *the shareholders of* the Issuers and to Archegos concerned Archegos's massive market manipulation scheme, its likely insolvency as a result of its enormous losses, its inability to satisfy its lenders' margin calls, and the imminent liquidation of massive amounts of securities underlying its holdings.  More specifically, the MNPI possessed by Defendants Morgan Stanley and Goldman Sachs includes but is not limited to:

- Archegos's massive, highly leveraged, and concentrated beneficial ownership positions in each of the Issuers, in excess of both the 5% beneficial ownership thresholds of Section 13 and the 10% beneficial ownership thresholds of Section 16 of the Exchange Act and the rules and regulations promulgated thereunder;

- Archegos structuring its investments in these companies pursuant to a TRS strategy specifically as a plan or scheme to evade the beneficial ownership reporting requirements of Sections 13 and 16 of the Exchange Act, and failing to disclose its positions in and control of the Issuers;

- By means of these non-public, massive, highly leveraged positions, and other tactics, Archegos had engaged in rampant market manipulation to distort and inflate the Issuers stock prices, such that the public prices for these shares did not reflect and were not the product of natural market forces of supply and demand, but rather were the artificial product of Archegos's manipulative trading and deceptive conduct;

- The exposure and significant risk posed by Archegos's massive and highly leveraged, positions in each of the Issuers, including through TRS, was exacerbated by its prime brokers', including Defendants Morgan Stanley's and Goldman Sachs's hedging strategies, pursuant to which they purchased their own reciprocal proprietary hedged shares;

- The exposure and significant risk posed by Archegos's highly leveraged, non-public, positions in each of the Issuers had increased dramatically during the first quarter of 2021, and this risk was further heightened because they were all concentrated positions of Archegos, such that a price drop in any one of them could lead to sales and consequent price drops in all of them;

- Rather than stop Archegos's trading and cut-off their fees as the risks increased, Defendants simply increased margin requirements and similar terms, making transactions more expensive for Archegos, and Archegos nevertheless kept

9

undertaking its many transactions that were atypical for investment firms, even as the Issuers' stocks continued to have price movements that were inconsistent with other market movements;

- By early January 2021, after repeated breaches of exposure limits, the ballooning risk posed by Archegos's positions led Defendants Morgan Stanley and Goldman Sachs, and other Counterparties to issue a series of escalating margin calls, demanding hundreds of millions of dollars in additional collateral from Archegos;

- By the week of March 22, 2021, Archegos's ability to cover these margin calls was all but exhausted when further declines across several of its significant long positions exacerbated its exposure, leading Defendants Morgan Stanley and Goldman Sachs, and its other Counterparties, to demand billions of dollars in additional collateral from Archegos;

- Facing massive escalating margin calls it could not meet and a consequent and catastrophic liquidity crisis, Archegos informed Defendants Morgan Stanley and Goldman Sachs, and its other Counterparties, that it did not have the liquidity to meet any of their margin calls;

- Archegos had convened a series of calls, at least from March 25, 2021 through March 27, 2021, with the Counterparties, including Defendants Morgan Stanley and Goldman Sachs, informing them that while its equity had declined to less than $10 billion its aggregate exposure had ballooned to over $120 billion, and proposing that its prime brokers standstill or forbear on triggering events of default while it orchestrated a managed liquidation; and

- Defendants Morgan Stanley and Goldman Sachs and Archegos's other Counterparties also held a series of calls and meetings to discuss the possibility of an orderly managed liquidation of the Issuers' shares.

18.    Defendants Morgan Stanley and Goldman Sachs knew, or were reckless in not knowing, that they were prohibited from trading based on this confidential market-moving information, but traded anyway, disposing to Lead Plaintiff and other shareholders of •Baidu, their proprietary holdings in Baidu before the news about Archegos was announced and the share price plummeted.

19.    As a result of Defendants Morgan Stanley's and Goldman Sachs's illicit insider trading misconduct, Lead Plaintiff and other members of Baidu Investor Class suffered severe losses while Defendants realized billions of dollars in losses avoided and other unjust enrichment.

## JURISDICTION AND VENUE

20.    The claims asserted herein arise under §§10(b), 20A, and 20(a) of the Exchange Act, 15 U.S.C. §§78j, 78t-1, and 78t(a).

21.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337, and §27 of the Exchange Act, 15 U.S.C. §78aa.

22.    Venue is proper in this District pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §1391(b).  Defendants Morgan Stanley and Goldman Sachs are both based in this District.

23.    In connection with the acts, conduct, and other wrongs alleged in this Second Amended Class Action Complaint, Defendants Morgan Stanley and Goldman Sachs, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the U.S. mail, interstate telephone and data communications and facilities of the national securities exchange.

11

## PARTIES

24.     As set forth in the previously filed Certification [Case No. 1:21-cv-10791-PAC, ECF No. 25-2], Lead Plaintiff acquired Baidu common stock or ADS or ADR (BIDU) during the Class Period and was damaged when the MNPI was publicly disclosed at the end of the Class Period, and the price of Baidu common stock or ADS or ADR declined as a result.

25.     Defendant Goldman Sachs is a global financial services institution. Goldman Sachs was one of Archegos's prime brokers, helping it make trades, lending it capital in the form of margin lending, serving as swap counterparty and receiving MNPI from Archegos in the process. It is incorporated under the laws of Delaware and maintains its headquarters at 200 West Street, New York, New York 10282.

26.     Defendant Morgan Stanley is a global financial services institution. Morgan Stanley was one of Archegos's prime brokers, helping it make trades, lending it capital in the form of margin lending, serving as swap counterparty and receiving MNPI from Archegos in the process. It is incorporated under the laws of Delaware and maintains its headquarters at 1585 Broadway, New York, New York 10036.

27.     Archegos was a family office headquartered in New York, New York exempt from registration as an investment adviser under Rule 202(a)(11)(G)-1 of the Investment Advisers Act of 1940. As of March 2021, Archegos managed over \$36 billion in invested capital. In late March 2021, Archegos defaulted on a number of significant margin calls, causing the family office's closure shortly thereafter. Archegos is not currently active.

## SUBSTANTIVE ALLEGATIONS

I.    **DEFENDANTS' RELATIONSHIP WITH ARCHEGOS**

A.    **Archegos, an Unregulated Family Office with a History of Illicit Trading, Depended on Its Prime Brokers, Including Defendants, to Provide It with Swaps and Margin**

28.    Hwang, after working for Julian Robertson's Tiger Management Corp., founded his own hedge fund in 2001.  Known as Tiger Asia (Tiger Asia Management, LLC and Tiger Asia Partners, LLC), it grew to over $5 billion at its peak.

29.    However, in 2012, Hwang and Tiger Asia entered into a settlement with the SEC for insider trading and market manipulation.  Notably, Tiger Asia's performance and NAV had dropped significantly in the preceding years.

30.    The SEC settlement covered Hwang's and Tiger Asia's illegal practice of insider trading and market manipulation in the securities of Chinese companies.

31.    As a result, the SEC banned Hwang from managing money on behalf of clients for at least five years, while Tiger Asia paid $44 million in disgorgement and penalties.  *SEC v. Tiger Asia Mgmt.*, No. 12-cv-7601 (D.N.J. Dec. 12, 2012), ECF No. 1; Consent of Tiger Asia Management, LLC, *SEC v. Tiger Asia Mgmt.*, No. 12-cv-7601 (D.N.J. Dec. 12, 2012), ECF No. 3-1.

32.    In a parallel criminal action brough by the DOJ also in December of 2012, Tiger Asia pleaded guilty to one count of criminal wire fraud, admitted to the same or similar facts that were set forth in the SEC settlement, was sentenced to one year of probation and agreed to forfeit more than $16 million in illegal profits.  Information, *United States v. Tiger Asia Mgmt.*, No. 12-cr-808 (D.N.J. Dec. 12, 2012), ECF No. 1; Plea Agreement, *United States v. Tiger Asia Mgmt.*, No. 12-cr-808 (D.N.J. Dec. 12, 2012), ECF No. 3.

33.     This led Hwang to return all outside investor capital, and, in approximately 2013, convert Tiger Asia into a family office to manage his own wealth, certain family money, and the deferred compensation of his employees.  He renamed it Archegos (Archegos was the Investment Manager of the related Archegos Fund, LP).  Hwang wholly owned and controlled Archegos, and was solely responsible for all investment decisions made by it or on its behalf.

34.     As Archegos operated under the SEC Family Office Rule, it was exempt from regulatory oversight pursuant to the Investment Advisers Act of 1940 on the theory that a "family office" manages its own wealth and thus the investor protections of the Investment Advisers Act for outside money are unnecessary.  Thus, unlike typical hedge funds, Archegos was, among other things, not subject to examination or inspection by the SEC and was not required to regularly report information regarding its holdings and borrowing to the SEC and the Financial Stability Oversight Council.

35.     Other aspects of the family office structure increased Archegos's risk profile as well.  For example, as one of its prime brokers explained even before its collapse, Archegos had "poor risk management" and did not operate with a formalized set of risk management policies and procedures, but rather used informal concentration guidelines, and did not use stop loss limits. Hwang oversaw the risk himself.

36.     Though technically classified as a "family office," Archegos still operated as a sophisticated investment firm.  By in or about 2021, Archegos employed more than fifty employees, paid consultants, engaged various outside vendors, and held numerous banking and brokerages accounts.  Its employees received compliance trainings and Archegos maintained a compliance manual which notably warns that "[i]t is essential that no employee or principal of Archegos engages in any activity the purpose of which is to interfere with the integrity of the

marketplace," as that "is a violation of the securities laws and of Archegos'[s] policies and standards of conduct."

37.    Like with other large investment funds, prime brokerage was key to Archegos's operation and success.  Archegos used Defendants Morgan Stanley and Goldman Sachs as two of its prime brokers, as well as other banks, including Credit Suisse and Nomura (collectively, "Prime Brokers" or "Counterparties").

38.    Such funds rely on their prime brokers to provide a large bundle of services including securities lending, capital introduction, trading, swap and derivative transactions, clearing, and advising on a variety of topics.

39.    A summary of several of the key prime brokerage services that were central to Archegos's operations, misconduct and collapse is set forth immediately below.

*Total Return Swaps*

40.    A total return swap, or TRS, is a derivative contract under which the client acquires the benefits of owning an asset without actually purchasing it.  It is a contract which entitles the client to receive payments equivalent to the total return on a reference asset, such as a given number of shares of a particular company's stock, in exchange for paying certain fees to the counterparty for providing the TRS and potentially making certain payments to the counterparty that function like interest payments.  If the value of the reference asset increases then the payments the client receives will increase correspondingly, but if the value of the reference asset decreases then the client will receive smaller payments or may be required to make payments to the counterparty. The client also must provide the counterparty with some amount of collateral or margin corresponding to a certain amount of the reference asset to protect the counterparty against the risk that it will not make its payments.  Thus, the client entering into a TRS gets the benefit of any price

increases in the underlying assets, and pays for any decreases, just as it would if it actually owned those assets.

41.     Following the industry standard, Defendants Morgan Stanley and Goldman Sachs, along with the other Counterparties, sought to protect their profits from the fees they earned as a TRS counterparty by hedging the asset referenced in the TRS.  While there are many different ways to hedge, here Defendants hedged by purchasing, on their own, the asset referenced in the TRS as their proprietary hedged shares.  The Counterparties' proprietary hedged shares were distinct from Archegos's shares that it posted with the Counterparties as part of the TRS contract.

42.     This meant that if the value of the referenced asset increased and Defendants owed a greater payment under the TRS, then the increased value of their proprietary hedged shares would offset the additional payment they owe; and if the value of the referenced asset decreased, then Defendants would make a smaller payment or even receive a payment under the TRS which would offset the decreased value of their own proprietary shares.  In either case, changes in the amount of the payments under the TRS would have no impact on Defendants, their overall posture would remain neutral thanks to their proprietary hedged shares, and they would keep all of their fees under the TRS as profits.  When entering TRS orders, Archegos could often select the trading volume as a parameter for purposes of executing its TRS or otherwise select an algorithm that generally aligned with certain trading volumes.

43.     One problem with this hedged strategy, however, is if the client taking out the TRS is not able to make the additional payments it owes when the value of the reference asset drops. In that case, not only would Defendants' and other Counterparties' lose the payments they are owed under the TRS, but their proprietary hedged shares would also lose value.

44. As detailed below, an important characteristic of TRS is that they can enable investment funds to attempt to evade SEC reporting requirements.

45. Another important characteristic of TRS is that, as a matter of economics, they are very similar to trading with leverage or through traditional margin lending. When the client enters into a TRS referencing a given number of shares of the underlying security, the amount of money it is paying on the TRS only corresponds to a relatively small percentage of those shares, with the exact percentage set by the prime broker based on relevant risk factors, as in a loan. Further, as described above, the prime broker serving as the counterparty will hedge its exposure under the TRS, by acquiring the amount of shares the TRS covers, whether of the underlying security or a similar security, not just the percentage that the client's payment corresponds to.

46. Prime Brokers often prefer to issue TRS because they can construct TRS in the foregoing market neutral fee-generating structure, and because TRS can be preferable for their capital structure.

47. Archegos entered into numerous TRS with its Prime Brokers, including Defendants Morgan Stanley and Goldman Sachs. As set forth below, those TRS enabled Archegos to evade reporting requirements, extend its leverage, and manipulate markets.

48. One particularly risky subcategory of TRS that Archegos often used is called a "bullet swap." That is a TRS with a term longer than one year, a static initial margin, and no periodic reset based on fluctuation in asset value. Clients sometimes prefer bullet swaps in order to avoid intermediate taxation events. However, bullet swaps expose prime brokers to significant risk of market erosion over the life of the swap because of the possibility that the underlying assets will appreciate significantly over the swaps' lengthy terms, while the margin remains static, such that the relative value of the margins will erode substantially.

*Margin Lending*

49.     Another core prime brokerage service is margin lending, in which a prime broker lends a client money to invest.  This is one of the main sources of financing for investment funds.

50.     In a margin lending arrangement, the prime broker lends a client capital to purchase stock and then holds that stock as collateral to protect the loan.  The loan from the prime broker covers up to a specified percentage of the stock's cost, while the remainder of the cost – the "margin" – is paid by the client and serves as further protection for the prime broker.  The amount of the loan provided by the prime broker is calculated based on factors including counterparty risk and total portfolio risk.

51.     Unlike TRS, in traditional margin lending the client owns all of the stock being purchased both on margin and through the loan.  Thus, if a client were to acquire more than 5% ownership in a company or pass other ownership thresholds through margin lending it would not be able to evade disclosing that position publicly.

52.     When a client purchases stock with margin lending, the amount of margin required by a prime broker may be a static, fixed amount based on the notional value of the securities at the time of their purchase.  Alternately, the margin may be dynamic, and may fluctuate over time based on a set percentage of the value of the securities, requiring a changing margin amount in proportion to the change in the securities' value or other factors.

53.     Prime brokerages earn revenue from these financing activities by taking the spread on their clients' net margins from their various transactions.

54.     Archegos acquired a substantial amount of securities on margin through its Prime Brokers, including Defendants Morgan Stanley and Goldman Sachs.  As set forth below, this contributed to Archegos taking an extreme and atypical amount of leverage on its positions.

*Block Trading*

55.     Prime brokers also arrange block trades, which are large, privately negotiated securities transactions.  Per NASDAQ and NYSE, they typically cover at least 10,000 shares or over $200,000.  If a client wishes to undertake such a transaction, a prime broker will seek to arrange a counterparty or group of counterparties for it, though the prime broker may acquire the stock itself first, serving as middleman between the buyers and sellers.

56.     Block trading is thus one of the few remaining areas wherein deals are still governed heavily by personal relationships, and the acquiring funds are often parties with whom the banks have preexisting relationships.  Prime brokers charge a fee for undertaking the block trade, and can profit on the spread between the discounted price at which they buy the block of stock from the client and the price at which they then resell that stock.  The amount of block trading has increased substantially over the last decade or so, and covered $70 billion worth of transactions in 2021.

57.     Defendant Morgan Stanley is the leading provider of block trades, and Defendant Goldman Sachs is also among the top block trade providers.  Block trades involving those Defendants played an important role for Archegos, particularly during the week of March 22, 2021 when it collapsed.

**B.     Defendants Agreed to Serve as Archegos's Prime Brokers, Despite Its Troubling History, and to Facilitate Its Manipulative Trading in Exchange for Substantial Fees**

58.     Acting as a prime broker can be very lucrative, with the largest global banks generating $15.2 billion in revenue from those services in 2020, despite a decline from the previous year's total attributable to the COVID-19 pandemic.  That year, the two leading prime brokers servicing investment funds were Defendants Morgan Stanley and Goldman Sachs who respectively controlled 34% and 32% of the prime brokerage market.  The relative significance of

prime services to bank revenue has increased over the past decade, leading Defendant Morgan Stanley to refer to prime brokerage in 2019 as "sort of the center of the [equity] machine." Moreover, analysts have estimated that more than half of prime brokers' financing revenue in the first half of 2020 was from synthetic financing, such as TRS, which can also carry a lower balance-sheet cost for a bank than traditional lending.

59.     But that opportunity for profit can also come with substantial risk, since core prime brokerage services like margin lending and serving as a TRS counterparty involve loaning substantial amounts of money to investment funds making a variety of market bets.  Banks thus run a variety of risk analyses to determine whether they should extend prime brokerage services to a potential client at all, and if so under what terms.  These terms include: how much overall exposure a client may have, what hedges it must take, how much margin or collateral it must post, how much it may transact with respect to a particular security or group of securities, the amount of interest payments, and other conditions that expand or restrict a client's ability to trade.  These risk analyses and terms are updated over the course of the prime brokerage relationship, and cover a client's overall portfolio as well as particular transactions.

60.     Prime brokers thereby gather a substantial amount of information regarding their clients, ranging from the clients' operations, to their other counterparties, to their holdings, patterns and performance.  Prime brokers are notoriously scrupulous before agreeing to provide their services, and in particular before lending capital.

61.     Banks were well aware of Hwang's history of volatile performance, market manipulation and insider trading, and for years following his conviction several refused to provide him and Archegos with prime brokerage services due to the high risk he entailed.  This included Defendant Goldman Sachs, where executives in its prime brokerage division had long tried to open

an account for Hwang, only for its compliance department to consistently shut those attempts down.

62.    Even those banks that provided Archegos with prime brokerage services were keenly aware of the high risk of transacting with him.  As one such Prime Broker wrote during a regular review of Archegos, that its weaknesses included a "key man reliance" on Hwang, "volatile performance," "mediocre operational management practices/fraud risk," and "poor risk management practices and procedures."  It further found that "Archegos does not operate with a formalized set of risk management policies and procedures, operates off informal concentration guidelines, and does not use stop loss limits."  These deficiencies were also emblematic of the heightened risk of transacting with lightly regulated family offices.

63.    However, prime brokerage is a highly competitive business with banks searching for revenue, and as detailed below, Archegos engaged in an usually large amount of transactions, making it an especially large source of fees for its prime brokers.  Accordingly, as the *Financial Times* wrote in late March 2021, "fee-hungry investment banks were ravenous for Hwang's trading commissions and desperate to lend him money so he could magnify his bets."  Prime Brokers were lending to Archegos so that it was as much as eight times levered overall – for every one stock Archegos bought with its capital, banks lent it seven more – with the leverage ratio on particular transactions hitting as high as twenty.

64.    The *Financial Times* quoted an executive at a bank with billions of dollars of exposure to Archegos as stating, "[i]t's pretty hard for me to defend why we loaned [Hwang] so much."  The executive continued, "[i]t's inconceivable that we loaned him so much or that we were not aware of the other banks' positions."

65.    A *Bloomberg* article from April 2021 confirmed that "[a]ll that activity made Archegos one of Wall Street's most coveted clients.  People familiar with the situation say it was paying prime brokers tens of millions of dollars a year in fees, possibly more than $100 million in total."  The article also explained that as Archegos's frequent trading and TRS manipulated the prices of his concentrated securities positions ever higher, this created a cycle in which he was able to invest more money into those positions to keep driving their prices up, and the prime brokers kept earning greater and greater fees from those repeated transactions.

66.    It was under these conditions that Defendant Goldman Sachs's desire for revenue eventually trumped its compliance department, and it finally became one of Archegos's Prime Brokers in 2020.

67.    Meanwhile, Defendant Morgan Stanley had become the Prime Broker with the largest piece of Archegos's business by the time of its collapse.

68.    A Tokyo-based banker familiar with Archegos and its Prime Brokers summed this up, as reported in the *Financial Times*, "[y]ou get a pretty good understanding of the general situation around Hwang, and the kind of calculations these prime brokers were all making about risk and reward when you look at the way Goldman behaved."  Goldman Sachs blacklisted Archegos for years, which "felt like a no-brainer considering Hwang's reputation.  Then suddenly they are doing everything they can to get him as a client and lend him money," the banker added. "So it's greed trumping fear, right until that stopped last week" and Archegos collapsed.

### C.    Defendants' History of Tipping MNPI They Received from Investment Funds to Facilitate Front-Running

69.    Since 2018, the SEC and DOJ have been conducting a probe on banks that arrange block trades, including Defendants Morgan Stanley and Goldman Sachs.  The probe focuses on misconduct by the banks, like whether they are telling preferred funds not otherwise involved in a

22

given block trade about the trade shortly before its takes place.  This tipping of material information, which as described above is supposed to be highly confidential and non-public, allows the funds to front run the block trade.  Such tipping is impermissible and violates, for example, the express language of FINRA Rule 5270.[1]

70.     When Defendant Morgan Stanley acknowledged that U.S. regulators and prosecutors were investigating "various aspects" of its block-trading business, *Bloomberg* reported that competitors, who had long observed Defendant Morgan Stanley bidding for block trades at "tight discounts" swapped "I told you so's."  Prime brokers make money on block trades based on the spread between the price at which they purchase the block of stock from the client, and the greater price at which they sell the block stock.  If Morgan Stanley won the bid to conduct a client's block trade by suggesting a willingness to purchase the stock at a relatively high price, but then through tipping causes the stock's price to drop just before the block trade, it will be able to purchase the block of stock at a lower price than it suggested, and make a larger amount of money on the spread when it sells the block.

71.     Market participants have alleged that Defendants Morgan Stanley and Goldman Sachs regularly engage in front running and tipping, flagging impending confidential block sales to favored clients prior to those sales becoming public, who then take out short sales on the stock, and thereby causing the relevant stock prices to fall just before the block trades are executed, as the preferred clients sell large amounts of the stock.  This results in greater profits for Defendants, as set forth above, and also benefits the preferred clients receiving the tip, because after a block

---

[1]     That Rule prohibits a member or person associated with a member from "caus[ing] to be executed an order to buy or sell a security related financial instrument when such member or person associated with a member causing such order to be executed has material, non-public market information concerning an imminent block transaction in that security, a related financial instrument or a security underlying the related financial instrument prior to the time information concerning the block transaction has been made publicly available or has otherwise become stale or obsolete."

trade is executed, a stock's price typically falls from the large amount of stock being sold, which means that their short sales will be profitable. But it harms the client requesting the block trades, because its large block of stock will be sold at a lower price than planned and than normal market forces would dictate.

72.     In fact, observers have reported a predictable pattern in Defendants Morgan Stanley's and Goldman Sachs's frontrunning behavior around block trades that they arrange. Specifically, the price of the stock at issue in a given block trade begins to decline in the morning or early afternoon, around the time a client seeking a block trade typically alert bankers to their plans. This pattern of a decline of a stock price just before a large block sale has become so common and so closely associated with Defendant Morgan Stanley that it is often derided by industry insiders as "the Morgan Stanley Fade."

73.     Articles in *Bloomberg* from February 2022 describe the civil and criminal probes in greater detail, and their focus on communications between bank executives responsible for block trading and preferred clients. With respect to Morgan Stanley, probes have homed in on: Pawan Passi, who was during the relevant period the bank's longtime head of U.S. equity syndicate desk; Charles Leisure, who was an executive director on the bank's syndicate desk; Evan Damast, its global head of equity and fixed-income syndicate; and John Paci, a senior equity trading executive. As *Bloomberg* wrote:

> ***Passi's frequent phone contacts and some of Morgan Stanley's key clients are among a roster of more than a dozen executives at other investment firms and banks whose communications are being scooped up by the Justice Department for scrutiny***, according to people with knowledge of the matter. In some cases, authorities are seeking access to online chats, mobile phone texts, emails and messages sent by apps, the people said, asking not to be named discussing the confidential demands.
>
> The list of people whose communications are being sought ranges from executives at prominent Wall Street hedge funds, such as Andrew Liebeskind at Citadel's Surveyor Capital and Jon Dorfman at Element Capital Management, to money

managers at smaller firms focusing on block trades, including executives at CaaS Capital Management and Islet Management, and a former employee at Segantii Capital Management, the people said.

Bankers include Felipe Portillo, a risk executive within Credit Suisse Group AG's equity capital markets group, Michael Daum, a partner at Goldman Sachs Group Inc., and Michael Lewis, the head of U.S. equities cash trading at Barclays Plc, the people said. Lewis worked at Morgan Stanley until 2018.

[Emphasis added].

74.    *Bloomberg* also reported that Defendants Morgan Stanley's and Goldman Sachs's front running of block sales has become so widespread that many private equity firms have been forced to develop strategies to minimize its impact, with such leading investment firms as Blackstone Inc., Carlyle Group Inc., and KKR & Co. ("KKR") expressing frustration with the banks.  KKR, for example, "seeks to partner with one bank early in the sale process, rather than auction the business to a number of banks and increase the number of people aware of an imminent deal . . . [t]he goal of that approach [being] to avoid surprise movements in a stock that can potentially occur if one of the banks bidding for business engages in misbehavior, and to facilitate better post-block trading in a stock. . . . [a]s a result, KKR has reduced the frequency of its interactions with banks including, among others, Morgan Stanley . . . ."

75.    After news of the block trading probes broke in or about February 2022, additional market participants, including Archegos, accused Defendant Morgan Stanley of tipping and front running.  Archegos alerted the U.S. authorities to a potential "Morgan Stanley Fade" incident in relation to the securities of Futu Holdings Ltd. ("Futu"), a Chinese online broker.  Months earlier, Archegos had wanted to exit a massive short bet on Futu using swaps and sought the help of Passi – that is, it effectively wanted to buy a large amount of Futu shares.  But before Archegos could execute the block trade, the price of Futu's shares skyrocketed, eventually gaining more than 400% over the following months.  Similarly, another investment firm, Disruptive Technology Solutions

("Disruptive"), filed a FINRA arbitration demand against Defendant Morgan Stanley for "front-running a block trade in Palantir [Technologies Inc.] stock."  Disruptive further identified Passi as their contact, and stated that "Morgan Stanley and a senior executive . . . leaked information ahead of the fund's sale of more than $300 million of Palantir shares in February 2021," resulting in Palantir's stock plummeting shortly before the trade and the firm suffering tens of millions of dollars in damage on that transaction.

76.     A *Wall Street Journal* analysis of 393 block trades executed between July 2018 and 2021, published after the probe was announced, found that information about block trade "routinely leaks out ahead of time" by investment banks to preferred clients.  This was based in part on a review of the share-price of stocks where banks arranged a block trade, and the movement of their stock prices compared to the price change in a related index shortly before the block trade occurred.  The analysis found that:

> 58% of the time, the share price declined in the trading session immediately before[] [a block trade], controlling for the performance of peer companies. Of the 268 trades for which the Journal was able to determine how much the banks paid, the sellers would have received $382 million more if the stocks had performed in line with the benchmark, or about $1.4 million per trade.
>
> A handful might be explained by a negative headline or chalked up to bad luck. But ***the persistent pattern of stocks falling in the run-up to big insider sales suggests a more widespread problem: Information that should be confidential is getting out.***

[Emphasis added].

77.     The *Wall Street Journal* also found that in over 174 block trades executed by Defendant Morgan Stanley between June 2018 and July 2021, the relevant stock at issue underperformed its benchmark index by 0.7 percentage points on a median basis, indicating a stock drop just prior to the trades consistent with the Morgan Stanley Fade.  That was the most egregious performance of any bank involved in block trading.  Recent examples of the Morgan Stanley Fade

cited by *Bloomberg* and the *Wall Street Journal* include block trades they arranged involving Discovery, Kraft Heinz, ZoomInfo, and Iqvia Holdings Inc.  The *Wall Street Journal* also found that stock underlying Goldman Sachs's block trades experienced an underperformance compared to a benchmark index.

78.    As detailed below, the probe into block trades accelerated following Archegos's collapse.  Defendants Morgan Stanley and Goldman Sachs traded on MNPI they received from Archegos, including that its collapse was imminent, and unloaded billions of dollars' worth of stock in just a few days through highly unusual block trades.  This illegal front running saved Defendants billions of dollars.

II.    **WITH DEFENDANTS' ASSISTANCE, ARCHEGOS DEVELOPED POSITIONS THAT MADE IT AN INSIDER IN BAIDU ALONG WITH SEVERAL OTHER SECURITIES, MANIPULATED THEIR PRICES, AND HID THIS FROM THE RELEVANT COMPANIES AND THE MARKET**

A.    **In the Spring of 2020, Archegos Switched Its Investing "Strategy," and Concentrated Its Portfolio in Several Large, Highly Leveraged Positions of Mid-to-Small Cap Companies**

79.    From its inception in 2013 through early 2020, Archegos generally took positions in large companies with highly liquid stock.  It also generally traded infrequently and avoided day-trading.  Thus, in March 2020, Archegos's top 10 holdings included mega-cap blue chip technology compagnies like Amazon and Microsoft.

80.    This pattern changed around the spring of 2020, with the onset of the COVID pandemic and related market losses.  With Archegos's blue chip holdings down too, it sold those positions.

81.    Archegos then implemented a 180-degree change in its trading strategy as it began to build massive, highly concentrated, positions in just several mid-to-small cap companies. Archegos's use of leverage also increased to as much as 6x on a portfolio basis, which was

atypically large for an investment fund. As such, by March 2021, Archegos's top holdings were mainly long-positions in a few US media companies, ViacomCBS along with Discovery, and a handful of Chinese technology companies, such as Gaotu, IQIY, Baidu, and Tencent.

82. Archegos repeatedly double-downed on this new "strategy" over the course of 2020 and early 2021, with its holdings in the following nine companies, including the Issuers, increasing dramatically and coming to account for the vast bulk of its portfolio by March 2021:

| Ticker | Number of Shares[2] (Market Value) | | | |
|---|---|---|---|---|
| | **July 1, 2020** | **October 1, 2020** | **January 1, 2021** | **March 22, 2021** |
| VIAC | 49.3M ($1.2B) | 123.0M ($3.4B) | 185M ($6.7B) | 286M ($28.6B) |
| BIDU-ADR | 11.2M ($1.4B) | 22.3M ($2.8B) | 31.6M ($6.6B) | 55M ($14.6B) |
| TME-ADR | 59.0M ($788M) | 118.0M ($1.8B) | 210M ($4B) | 326M ($10.0B) |
| GSX-ADR | 19.3M ($1.1B) | 38.8M ($3.6B) | 70M ($3.4B) | 101M ($8.5B) |
| VIPS-ADR | 36.4M ($759M) | 79.0M ($1.3B) | 115M ($3.2B) | 169M ($7.6B) |
| DISCA | 3.0M ($63M) | 3.0M ($65M) | 60M ($1.8B) | 100M ($7.5B) |
| IQ-ADR | 67.2M ($1.6B) | 105.3M ($2.4B) | 155M ($2.8B) | 225M ($6.3B) |
| DISCK | 1.3M ($25M) | 1.3M ($27M) | 1.3M ($34M) | 91M ($6.0B) |
| FTCH-ADR | 6.4M ($116M) | 18.4M ($500M) | 37M ($2.2B) | 92M ($5.7B) |
| SHOP-ADR | N/A | N/A | 970 ($1M) | 1.7M ($1.9B) |

83. The increase in size of Archegos's exposures to these companies also allowed it to assert a dominant market position over their stock and stock price. For example, by late March 2021, Archegos's control over those companies, including the Issuers, taking into account its equity and derivatives such as TRS, equated to the following percentages of their outstanding shares:

| Ticker | % of Outstanding Shares |
|---|---|
| GSX-ADR | Over 70% |
| DISCA | Over 60% |
| IQ-ADR | Over 50% |
| VIAC | Over 50% |
| TME-ADR | Over 45% |
| DISCK | Over 30% |

---

[2]    Share count includes cash equity and derivative SBS positions cumulatively.

84.    Archegos's positions became so large that they significantly altered the shareholder composition of these companies in which it most heavily invested, including the Issuers, with it coming to dominate them.  The following chart illustrates that point, and shows how Archegos's pushed out other shareholders and came to control ViacomCBS stock within approximately one year:



85.    Since substantial portions of some of the above-mentioned securities' floats were held by index funds, the size and significance to the market of Archegos's positions were magnified.  By design, those index funds would not sell holdings of stocks included in the relevant index regardless of market performance, as a result of which Archegos's positions affected even larger percentages of the freely trading shares.

29

86.    Archegos's own portfolio also became heavily and dangerously concentrated in the foregoing companies over the year ending in March 2021, as the chart three paragraphs above setting forth the amount of shares Archegos controlled in each of the Issuer's stocks reflects.  Also, since these positions were large in comparison to the average daily trading volumes of these companies' stock, they could not be easily liquidated.

87.    This excessive loading up on concentrated long positions within one year dramatically increased the size of Archegos's investments and exposure.  From March 2020 to March 2021, Archegos's assets under management grew fifteen-fold, from about $1.5 billion to $35 billion.

88.    But, because of Archegos's heavy use of derivatives like TRS and margin lending, its growth in assets under management only represented a small part of its exploding total exposure during that year.  At the beginning of March 2020, Archegos's aggregate gross exposure was $19 billion, and its net exposure was $7 billion long, consisting of $13 billion in aggregate long exposure and $6 billion in aggregate short exposure.  But as of March 19, 2021, its exposure had exploded to approximately $160 billion in aggregate gross exposure and $52 billion long in net exposure, consisting of $106 billion in aggregate long exposure and $54 billion in aggregate short exposure.

89.    Moreover, as of March 19, 2021, a little over half of Archegos's gross portfolio – about $86 billion – consisted of long, levered TRS positions referencing single securities, primarily in the foregoing companies.  At the same time, about 30% of its gross portfolio consisted of – amounting to roughly $50 billion – a variety of swaps that it used for short position.  The remainder of Archegos's portfolio – over $20 billion – consisted predominantly of long cash securities, most of which, as set forth above was on margin.

90.     Defendants, and the other Prime Brokers, enabled this rapid and dangerous explosion in Archegos's positions.  In exchange for facilitating the frequent and large transactions that Archegos undertook to build up those positions from March 2020 to March 2021, Defendants received substantial fees, as set forth herein.

### B.     Archegos Hid Its Enormous Positions from the Market and Sought to Evade Disclosure Requirements by Entering TRS with Defendants and Other Prime Brokers

91.     The SEC requires investors to publicly disclose their holdings when they cross certain thresholds of a company's stock, to, among other things, protect companies and their shareholders from insider trading.  For example, Section 13(d)(1) of the Exchange Act states that:

> Any person who, after acquiring directly or indirectly the beneficial ownership of any equity security of a class which is registered pursuant to section 78l of this title, or any equity security of an insurance company which would have been required to be so registered except for the exemption contained in section 78l(g)(2)(G) of this title, or any equity security issued by a closed-end investment company registered under the Investment Company Act of 1940 or any equity security issued by a Native Corporation pursuant to section 1629c(d)(6) of Title 43, or otherwise becomes or is deemed to become a beneficial owner of any of the foregoing upon the purchase or sale of a security-based swap that the Commission may define by rule, and is directly or indirectly the beneficial owner of more than 5 per centum of such class shall, within ten days after such acquisition or within such shorter time as the Commission may establish by rule, file with the Commission, a statement containing such of the following information, and such additional information, as the Commission may by rules and regulations, prescribe as necessary or appropriate in the public interest or for the protection of investors.  15 U.S.C. §78m(d).

92.     TRS can facilitate attempts by investors to evade these disclosure requirements, because, as set forth above, they provide investors with effective control of a specified amount of a company's stock without technically requiring them to acquire the stock themselves.  When a prime broker and TRS counterparty buys the specified amount of stock referenced in the TRS as its own proprietary hedge and hold the proprietary hedged shares for the life of the swap, it has the same impact on the stock's price and circulation as if the investor made the acquisition itself, and the investor receives the economic benefit or loss of the stock's price movements.  Market

31

participants, courts, and the SEC have observed investors engaging in this misconduct.

93.     Archegos used this precise ruse to build up its enormous positions in the Issuers' stock – well above the disclosure thresholds – and evade ever disclosing those positions.  Indeed, Archegos never publicly disclosed any stock positions or filed a single Form 13F report over its eight-year history.  This was unusual for investment funds, and even much smaller family offices commonly make such disclosures from time-to-time – notably, as the *New York Times* reported, Archegos had filled out the necessary registrations so that it could make such disclosures.

94.     Archegos would first establish its stock positions in cash equities that it acquired, until it approached 5% ownership of all outstanding stock of the company – it tracked its positions to keep them under that threshold.  At that point, Archegos shifted to gaining additional synthetic exposure to the issuer through TRS.

95.     Given the enormous positions in the Issuers' stock that Archegos controlled, this tactic meant that Archegos's holdings of TRS in their stock exploded in the year following March 2020, reaching about $86 billion, as noted above.  A recent report published by the European Securities and Markets Authority ("ESMA") demonstrates that point (many prime brokers hold the TRS they are counterparties to in Europe for regulatory reasons).  It found:

> Between January and end-2020, Archegos increased its exposures to TRSs, with notional amounts surging by approximately 180% (Chart 4). Since most of the reported activity was done through UK banks [the prime brokers at issue here], Archegos's exposures dropped mechanically in early 2021 when UK entities stopped reporting to EMIR. However, using EEA30 data, we can see a steep increase in exposures in February and March, with a jump in notional of approximately 365% from mid- January to mid-March.



96.    As the ESMA report shows, Archegos's use of TRS, through its Prime Brokers, continued to increase exponentially even from the end of 2020 to the end of Feb 2021, with its gross exposure 2.5 times larger and its net exposure seven times larger during that time. Archegos's exposure to TRS continued to increase in the first part of March 2021 as well.

97.    Moreover, the ESMA report stated that Archegos's "portfolio of swaps was mainly concentrated in five stocks (Chart 5): the top five stocks where Archegos had a long position accounted for 80% of its long exposures (and 360% of its net exposure)."

98.    The ESMA report also illustrates the connection between Archegos's ballooning TRS holdings, its Prime Brokers', including Defendants', reciprocal increase in the stock the TRS referenced through the purchase of their proprietary hedged shares, and the impact on the stock's price from those purchases, which was thereby driven much higher:

> Chart 6 [below] shows the evolution of trades on stock A. In August 2020, Archegos entered into a TRS with stock A as underlying. Archegos steadily increased its exposure to this stock until end-January 2021, where its exposure was 10 times higher than in August. Then, Archegos'[s] exposures to stock A increased very substantially, reaching on 17 March up to 4 times its end-January levels (35 times August levels). At the same time, the price of Stock A shares increased by

80% in approximately one month and a half. The surge in equity prices was likely driven by Archegos' [s] increased exposure to stock A, which resulted from an increasing exposure by its counterparties [its prime brokers] (SEC, 2022b; US DoJ, 2022). One week before its default, Archegos positions on stock A reported in [European Markets Infrastructure Regulation ("EMIR")] amounted to more than 3% of the floating and almost twice the average daily trading volume. This is visible from EMIR data even though these only offer a partial view of Archegos positions. Similar increases in positions can also be seen in other stocks.



99.     Since Archegos's Prime Brokers including Defendants were directly purchasing the Issuers' stock referenced in its TRS through their proprietary hedged shares, they filed 13F reports regarding those purchases; whereas Archegos, notwithstanding that it controlled vast amounts of the Issuers' shares, made no such disclosure.

100.    Thus, apart from Defendants and the other relevant Prime Brokers, no one knew that a single investor, Archegos, controlled massive amounts of stock in several companies or that it achieved this control through highly-levered transactions.  Nor did anyone know that Archegos's transactions were responsible for dramatically driving up the Issuers' stock prices in a short time, or that a drop in the price of any one of those stocks could cause all of them to crater by requiring Archegos to unwind all of its risky positions.

**C.    Archegos Manipulated the Stock Prices of Its Top Positions with Defendants' Assistance**

101.    From March 2020 through March 2021, Archegos's regularly engaged in transactions designed to manipulate the Issuers' stock.  This included Archegos rapidly building up massive positions in those stocks through margin lending and TRS, as detailed above, and also by covering such tactics as trading: (a) in the Issuers' stocks frequently, sometimes on a daily basis, including even increasing the price it paid for a given stock over the course of a single day; (b) to "defend" the price of stock facing negative press or market movements; (c) in amounts far exceeding volumes known within the securities industry; and (d) regularly trading at unusual hours designed to have the biggest market impact.

102.    Such manipulative tactics were uncommon for investment firms, and for Archegos prior to March 2020.  In that earlier period, Archegos historically instructed its traders to trade deliberately and discretely to avoid market impact, typically going days without adding to existing exposures and studiously avoiding trading volumes that could cause ripples in the market.

103.    By contrast, Archegos's post-March 2020 tactics were not based on a principled view of the true value of a particular issuer – Archegos had by this time effectively sidelined its research operation.  They were transparently intended to artificially inflate the Issuers' share prices.

104.    Archegos's use of these tactics acted much like a Ponzi-scheme, as the more it artificially drove the Issuers' stock prices up, and the more long-positions in their stock it took at elevated prices, the more it had to resort to these tactics to keep their prices propped up.  There was no substantive Issuer or industry specific events impacting those prices, with Archegos's positions expanding dramatically there was an increasingly small pool of the Issuer's stock available and investors vying for that stock, and Archegos would owe a tremendous amount of

money on its TRS an highly leveraged margin purchases if the stock prices dropped. Consequently, Archegos employed these manipulative tactics ever more frequently over the course of 2020 and early 2021. Rising stock prices could also in some instances free up extra margin for Archegos from its prime brokers, which it could then use to drive those prices even higher, in a continuing cycle.

105.    Defendants profited handsomely from facilitating Archegos's manipulative trading, because unlike other investment firms, this meant that Archegos was making regular and large orders, which generated substantial fees for its prime brokers. The Prime Brokers were aware of the risks that Archegos's conduct and trading entailed, as, rather than stop it and cut-off their fees, they simply increased margin requirements and similar terms when Archegos's positions grew – they eventually required up to 100% collateral on certain swaps. That Archegos continued to trade, even when those onerous terms made doing so much more expensive, was further evidence for the Prime Brokers that Archegos was desperate to keep its concentrated positions propped up. Similarly, when Prime Brokers began to limit Archegos's overall amount of exposure and ability to increase its long positions, Archegos continued to trade frequently and simply shifted to using more of its short-term tactics, like transacting at times that were most likely to influence the stock price, that served no other purpose than to inflate stock prices.

106.    There are numerous instances of Archegos undertaking these manipulative trading tactics. Archegos understood that buying or selling more than approximately 10-15% of a day's total trading volume of a given stock would likely affect a stock's price, and one tactic it used was to routinely transact in excess of these volumes. In fact, after March 2020, and particularly from January through March 2021, Archegos's daily transactions in the Issuer's stock regularly

exceeded 20%, often reaching 30% and even surpassing 40% of the daily trading volume of certain companies.  For instance:

      a.      Between November 16, 2020 to January 4, 2021, Archegos's trading of the stock and TRS referencing Discovery Class A shares reached or breached approximately 25% of Discovery Class A shares' daily trading volume on 17 of 33 trading days.  From November 24, 2020 to January 4, 2021, Archegos's trading only dropped below 20% of Discovery Class A shares' daily trading volume on 7 of 27 trading days and was greater than 30% ten times, including a high of 40%.

      b.      Between January 6, 2021 to March 24, 2021, Archegos's trading of the stock and TRS referencing Discovery Class C shares reached or breached approximately 25% of Discovery Class C shares' daily trading volume on 29 of 54 trading days.  From January 29, 2021 to March 11, 2021, Archegos's trading only dropped below approximately 20% of Discovery Class C shares' daily trading volume on 2 of 29 trading days and was greater than approximately 30% fourteen times, including a high of approximately 40%.

      c.      Between March 2, 2021 to March 23, 2021, Archegos's trading of the stock and TRSs referencing Farfetch reached or breached approximately 20% of Farfetch's daily trading volume on 14 of 16 trading days, including three days where trading surpassed approximately 40% of daily trading volume, including a high of over 50% on March 18.

      d.      Between October 2020 and March 2021, Archegos routinely accounted for more than 10% of the entire daily traded volume of ViacomCBS stock.  In February and March 2021, Archegos averaged more than 10% of the trading volume on a daily basis.  During that period, Archegos exceeded 15% of daily volume on approximately 10 of 40 trading days and exceeded 25% on approximately four days.

e.    Between December 2020 and March 2021, Archegos averaged more than 15% of the trading volume on a daily basis of Gaotu stock.  During that period, Archegos exceeded 30% of daily volume on approximately 11 days and exceeded 35% on approximately five days.

f.    Between November 2020 and March 2021, Archegos averaged more than 10% of the trading volume on a daily basis of Tencent stock.  Between on or about February 22 and March 26, 2021, Archegos exceeded 15% of daily trading volume on approximately 19 of 25 trading days and exceeded 20% on approximately 14 days.  Between October 2020 and March 2021, Archegos trading exceeded 35% of trading volume on approximately eight days.

107.    Archegos also used manipulative trading tactics to defend its inflated prices in the Issuers' stock in order to counteract selling pressure.  This involved undertaking long transactions at elevated prices and other non-economic trades.  For example, in March 2021, when Discovery Class C shares were in danger of falling below $60, an important stabilizing level, Archegos made repeated large trades above that point, including an individual transaction covering $50 million worth of its shares, and drove its price up to $62.99.  Other examples of this tactic involve Gaotu, ViacomCBS, and Farfetch.

108.    With respect to market timing, one tactic Archegos employed was to engage in substantial trading during the last 30 minutes of the trading day, or "marking the close," again to build upward price momentum into the next day with long transactions at elevated priced.  Also, since Archegos's margin at its Prime Brokers was based on end of day valuations, this would provide it with even more leverage to purchase exposure to the same Issuers the next day.  For instance, from January 25, 2021 to March 23, 2021, Archegos traded Baidu during the last 30 minutes during the majority of trading days, including 22 days when orders exceeded the equivalent of over 100,000 shares (in dollars exceeding $29 million on each of those days), and

four days when orders exceeded the equivalent of over 500,000 shares (in dollars exceeding $136 million on each of those days). As another example from that same period, Archegos also undertook substantial trading in Tencent during the last 30 minutes of the trading day.

109.    A different market timing tactic Archegos used was to enter into a series of transactions prior to market open to "set the tone" for the trading day, with elevated prices in the Issuers' stock, to create momentum to drive prices up over the course of the day. As an example, from January to March 2021, Archegos traded ViacomCBS pre-open 19 times, including two days when orders exceeded the equivalent of one million shares, and on every trading day but one from March 5 to 19.

110.    Owing to Archegos's manipulative tactics, which were undisclosed to anyone except for Defendants and the other Prime Brokers who facilitated them, the share prices of the Issuer's stock rapidly skyrocketed. For instance, the price of ViacomCBS stock skyrocketed approximately 150% in less than three months from January to March 2021, with a lack of publicly available information that would support such a share price increase.



VIAC Closing Price, 8/3/2020 - 4/30/2021

111.    The same phenomena happened with other of the Issuers' stocks in which Archegos controlled large positions.  For example:

- Discovery Class A



- Discovery Class C



- Vipshop Holdings Ltd.



112.    Significantly, these dramatic price increases occurred during the height of Archegos's manipulative tactics, and without correlated movements in the general market or similar stocks that Archegos was not heavily invested in.  The following chart illustrates that point, and shows that the stock price spikes of Discovery Class A and C shares and ViacomCBS are not correlated with the price of the NASDAQ-100 index (as reflected in Invesco QQQ Trust, an exchange-traded fund that tracks that index), with the y-axis reflecting the value of one dollar invested from the start of period:



41

113.    This increase in Issuers' stock prices simultaneously drove up the value of Archegos's TRS holding.  As the ESMA report stated:

> EMIR data can also be used to analyse the mark-to-market value of the portfolio of swaps held by Archegos. Since counterparties update the value of the swaps daily, it is possible to monitor changes in the valuation of the swaps. Chart 7 [below] shows the value of the swaps for Archegos. Between September 2020 and January 2021, the value of the swaps increased relatively smoothly, with positive values for the long positions and negative values on the short positions. The value of the portfolio of swaps then surged to a peak on 23 March, at more than ten times its end-January level, driven almost exclusively by profits on long positions. Between early February and 23 March the value of the swaps grew by 250%, reflecting the increase in the value of the underlying stocks and higher exposures taken by Archegos. Starting on 24 March, the value of the swaps collapsed, falling to a negative value of by 26 March, the day of the default of Archegos.



114.    In addition, the ESMA report confirmed that Archegos's spiking TRS values were highly concentrated in a handful of Issuers' stock it was manipulating:

> [T]he changes in the value of the swaps were almost entirely driven by long positions on four stocks, which together accounted for more than 80% of the mark-to-market value of the portfolio in March (Chart 8 [below]). The data show clearly that Archegos had a highly concentrated portfolio and that any negative change in the price of the underlying stocks could trigger large mark-to-market losses and substantial variation margins.



115. The chart below, which is based on the stock prices of two representative Issuers (ViacomCBS and Discovery), shows how the Issuers' stock prices rapidly plummeted in late March 2021 even as the broad market index was flat or rising. This occurred when Defendants unloaded billions of dollars of their proprietary hedged shares in the Issuers' stock, and also certain of the collateral in that stock they held from Archegos, in a matter of days as Archegos collapsed.



116.    As detailed below, Defendants raced to make those illegal insider sales based on MNPI they had received from Archegos, including that its collapse was imminent, before the market learned that information and the prices dropped even further.

### III.    ARCHEGOS PROVIDED MNPI TO DEFENDANTS FOR A PERSONAL BENEFIT, AND ALSO WITH THE EXPECTATION THAT DEFENDANTS WOULD TRADE ON IT

#### A.    MNPI Defendants Received from Archegos

117.    In the course of providing prime brokerage services, and through their respective prime brokerage agreement and contractual relationship with Archegos, Defendants Morgan Stanley and Goldman Sachs received MNPI from Archegos.

118.    This MNPI included, but was not limited to:

- Archegos's massive, highly leveraged, and concentrated beneficial ownership positions in each of the Issuers, in excess of both the 5% beneficial ownership thresholds of Section 13 and the 10% beneficial ownership thresholds of Section 16 of the Exchange Act and the rules and regulations promulgated thereunder;

- Archegos structuring its investments in these companies pursuant to a TRS strategy specifically as a plan or scheme to evade the beneficial ownership reporting requirements of Sections 13 and 16 of the Exchange Act, and failing to disclose its positions in and control of the Issuers;

- By means of these non-public, massive, highly leveraged positions, and other tactics, Archegos had engaged in rampant market manipulation to distort and inflate the Issuers stock prices, such that the public prices for these shares did not reflect and were not the product of natural market forces of supply and demand, but rather were the artificial product of Archegos's manipulative trading and deceptive conduct;

- The exposure and significant risk posed by Archegos's massive and highly leveraged, positions in each of the Issuers, including through TRS, was exacerbated by its Prime Brokers', including Defendants Morgan Stanley's and Goldman Sachs's hedging strategies, pursuant to which they purchased their own reciprocal proprietary hedged shares;

- The exposure and significant risk posed by Archegos's highly leveraged, non-public, positions in each of the Issuers had increased dramatically during the

first quarter of 2021, and this risk was further heightened because they were all concentrated positions of Archegos, such that a price drop in any one of them could lead to sales and consequent price drops in all of them;

- Rather than stop Archegos's trading and cut-off their fees as the risks increased, Defendants simply increased margin requirements and similar terms, making transactions more expensive for Archegos, and Archegos nevertheless kept undertaking its many transactions that were atypical for investment firms, even as the Issuer's stocks continued to have price movements that were inconsistent with other market movements;

- By early January 2021, after repeated breaches of exposure limits, the ballooning risk posed by Archegos's positions led Defendants Morgan Stanley and Goldman Sachs, and other Counterparties to issue a series of escalating margin calls, demanding hundreds of millions of dollars in additional collateral from Archegos;

- By the week of March 22, 2021, Archegos's ability to cover these margin calls was all but exhausted when further declines across several of its significant long positions exacerbated its exposure, leading Defendants Morgan Stanley and Goldman Sachs, and its other Counterparties, to demand billions of dollars in additional collateral from Archegos;

- Facing massive escalating margin calls it could not meet and a consequent and catastrophic liquidity crisis, Archegos informed Defendants Morgan Stanley and Goldman Sachs, and its other Counterparties, that it did not have the liquidity to meet any of their margin calls;

- Archegos had convened a series of calls, at least from March 25, 2021 through March 27, 2021, with the Counterparties, including Defendants Morgan Stanley and Goldman Sachs, informing them that while its equity had declined to less than $10 billion its aggregate exposure had ballooned to over $120 billion, and proposing that its Prime Brokers standstill or forbear on triggering events of default while it orchestrated a managed liquidation; and

- Defendants Morgan Stanley and Goldman Sachs and Archegos's other Counterparties also held a series of calls and meetings to discuss the possibility of an orderly managed liquidation of the Issuers' shares.

119.    As set forth herein, Archegos's Counterparties have conceded that they had this MNPI, and journalists, investigators and market participants have confirmed that as well.  For example, a *Barron's* article published later in 2021 reported:

> Risk managers at most prime brokers probe a fund's financials unsparingly, in the experience of the fund veteran. Trading credit is hard to get without documenting a fund's exposures, the manager says. Credit Suisse's investigation into its Archegos losses concluded that its ***risk managers should have spotted clues of undue risk***.

> [Emphasis added].

120.    But the article continued that the Prime Brokers did not act on this risk because Archegos was paying them too much to help keep its manipulative scheme going:

> Before the deluge, the money was good. A person familiar with the Archegos matter tells Barron's that in the March 2021 quarter of Archegos's collapse, the firms handling the fund's trades made over $200 million in revenue.

121.    Other reports discussed herein reached the same conclusion, including from the *Financial Times* and Credit Suisse.

1. ***In the Course of Providing Prime Brokerage Services to Archegos and Facilitating Its Manipulative Trading, Defendants Received MNPI from Archegos***

122.    Put simply, Defendants received MNPI regarding Archegos's large, concentrated positions in the Issuers' stocks, including through margin lending and TRS, along with its manipulative trading, because they played a major role in facilitating those transactions as prime brokers.

123.    Moreover, as Archegos took out even more long TRS in the Issuers' stock, especially in late 2020 and early 2021, without making any disclosure of the substantial amount of their stock it controlled, Defendants Morgan Stanley's and Goldman Sachs's proprietary hedged shares corresponding to the stock referenced in those TRS exploded, mirroring Archegos's positions.  This was reflected in Defendants' own 13F disclosures.  Among other things, as discussed below, they show that Defendants held massive shares of the Issuers' stock as proprietary hedged shares just prior to March 2021.  Defendant Goldman Sachs's 13F disclosures also show a large increase in its holdings in the Issuers' stocks in 4Q 2020, around the time it became one of Archegos's Prime Brokers, and Defendant Morgan Stanley's 13F disclosures show an increase in its holdings of the Issuers' stock in 4Q 2020, which was preceded by an even larger increase the previous quarter.

124.    Concurrently, the same was true for Archegos's other Prime Brokers, who were also Counterparties to Archegos's TRS and purchased their own proprietary hedged shares.  As a *Bloomberg* article from April 2021 reported, starting in the second quarter of 2020, all of Archegos's Prime Brokers became big holders of the stocks it was concentrating on, as reflected in the other Prime Brokers' Form 13F filings.

125.    Thus each Prime Broker had full visibility into Archegos's tactics and positions with respect to each of the Issuers based on their own extensive dealings with Archegos, and each

Prime Broker also knew that the concentrated positions in the Issuers' stock that Archegos controlled through them reflected Archegos's overall portfolio and was similar to the positions that Archegos controlled through its other Prime Brokers.  A report commissioned by Credit Suisse, one of Archegos's Prime Brokers, and written by Paul, Weiss following an investigation into Archegos's collapse found:

> *[Credit Suisse] was "keenly aware" that Archegos was also doing business with other prime brokers across the Street* and that a "sudden" margin increase could "result in irreversible damage to the client relationship."

> \*      \*      \*

> And while [Credit Risk Management] had access to non-public information from Archegos that revealed that *Archegos had additional concentrated exposure to the same single-name positions across the Street* as it did at [Credit Suisse] – thus substantially increasing Archegos's counterparty risk – [Credit Risk Management] failed to insist on additional disclosure from Archegos to assess the extent of this risk or to escalate the information it did have, including at the March 2021 [Credit Suisse Investment Bank Counterparty Oversight Committee] meeting.

> \*      \*      \*

> Throughout 2020, as discussed below, Archegos's trading bias inverted and the fund became substantially long-biased; it persistently breached its [potential exposure] and scenario limits; its leverage increased substantially (from 3-4x to 6x); its concentration increased; and *it confirmed to [Credit Risk Management] (as it had represented over the years) that its positions with its other prime brokers largely mirrored the positions it held with [Credit Suisse]* – which compounded the concentration risk of Archegos's portfolio with [Credit Suisse].

> \*      \*      \*

> Nonetheless, also on February 19, the [Credit Risk Management] analyst covering Archegos escalated the same concern that the [Prime Services Risk] analyst had elevated to the [Prime Services Risk] Head the day before: namely, that *Archegos's concentrated positions with [Credit Suisse] were likely also spread across its other prime brokers*. The [Credit Risk Management] analyst told his supervisors that, while Archegos refused to answer specific questions about its holdings at other prime brokers, Archegos had told him that, "as they leg in to positions, they ideally prefer to do so pro rata across their core [prime brokerage] providers," including [Credit Suisse], although that was not always accomplished. The [Credit Risk Management] analyst noted that [Credit Suisse] *"should assume that [Archegos]*

***potentially ha[d] additional exposure" on the same large, concentrated names "away from [Credit Suisse]."***

[Emphasis added].

126.    While this concurrent increase in Archegos's, Defendants', and the other Prime Brokers' control and holdings of the Issuers' stock was exploding, Archegos dramatically increased its representation to Defendants and the other Prime Brokers regarding the amount of stock of a company's stock that it could control.  More specifically, Archegos obtained TRSs pursuant to an International Swaps and Derivatives Association ("ISDA") Master Agreement as amended and supplemented by other documents, including a Portfolio Swaps Annex ("PSA").  In 2015, Archegos's PSA with one of its Counterparties included a provision representing that "on the date the parties enter into any Transaction, the aggregate amount of all such Shares beneficially owned by it for purposes of Section 13(d) of the Exchange Act, when combined with the notional amount of shares underlying any long derivative position, is less than 5% of the outstanding Shares."  But, in December 2020, the PSA was amended to increase the percentage of ownership threshold that Archegos was representing not to cross from 5% to 20% of the outstanding shares. This was an enormous jump, which effectively confirmed to the prime brokers that Archegos's control of the Issuers' stocks had exploded, and that its positions were well beyond the threshold where they were required to be disclosed, which Archegos was not doing.

127.    Defendants and Archegos's other Prime Brokers easily reached that conclusion regarding its positions.  For example, the Credit Suisse report recounted:

> Discussion [at the March Credit Suisse Investment Bank Counterparty Oversight Committee meeting] also highlighted Archegos's "[s]ingle issuer concentration," including a $3.3 billion position ***representing "more than 8% outstanding float*** (next five largest are in the range of USD 1.2bn to USD 1.5bn)."

*        *        *

> ***The business knew that Archegos's portfolio was highly concentrated***.
> For instance, by April 2020, Archegos's top five long positions represented
> approximately 150% of its NAV.

[Emphasis added].

128.     Similarly, in March 2021, Credit Suisse noted that Archegos held "[l]umpy single-issuer concentrations," with its five largest positions "ranging in size from $1.25bn (6% of GMV) to $3.3bn (16% of GMV)," which equated to at least 8-9% of the outstanding float in several of the Issuers' stock.

129.     Of course, Defendants and Archegos's other Prime Brokers also understood that Archegos built up these positions through TRS in an attempt to evade disclosure rules.  As the Credit Suisse report recounted, its current and former employees understood that Archegos preferred swap positions for their "anonymity."

130.     Beyond the extreme amount, concentration and leverage of Archegos's long positions, both as a percentage of the Issuers' outstanding stock and of Archegos's overall portfolio, Defendants, along with the other Prime Brokers, were also facilitating Archegos's highly atypical transactions patterns for an investment fund, such as the frequent trading in the Issuers' stock at large volumes, that made no sense other than as manipulative devices.  Indeed, Defendants were aware that while Archegos was engaging in these manipulative tactics, which were a departure from its previous trading patterns, the Issuers' stocks that were the subject of those tactics were significantly increasing in a price, in a manner that was inconsistent with price movements in the overall market.

131.     Defendants Morgan Stanley and Goldman Sachs, along with the other Counterparties, were aware of this and other information regarding Archegos's operations, performance, positions, and portfolio because they regularly made risk assessments and undertook extensive due diligence to determine whether to transact with Archegos, and on what terms they

might do so.  They also sought and obtained additional information from Archegos on an ad hoc basis, for instance, in response to events in Archegos's positions or to requests by Archegos to engage in additional trading.

132.    Further demonstrating their knowledge of the growing risk in Archegos's portfolio from March 2020 through March 2021, Defendants and the other Prime Brokers began to place limits or more onerous terms on Archegos's transactions over the course of that year, including demanding more collateral.  As a result, certain Counterparties refused to allow Archegos to execute additional long TRS positions in concentrated names, while others refused to allow such transactions without the posting of additional margin.  In turn, Archegos engaged in an unrelenting search for additional trade capacity in its concentrated positions, and communicated daily with its Prime Brokers on that subject, even agreeing to undertake transactions in the Issuers' stock at much higher margin and expense – another red flag for Defendants.  It was also during this search for additional trading capacity that Defendant Goldman Sachs reached terms to become one of Archegos's Prime Brokers.

133.    Accordingly, even if Defendants Morgan Stanley and Goldman Sachs may not have known the exact amount of Archegos's aggregate positions, they knew or should have known that Archegos's massive, levered and concentrated positions in the Issuers' stock posed an enormous risk.  To that point, the Credit Suisse report found:

> ***There were numerous warning signals*** – including large, persistent limit breaches – indicating that Archegos's concentrated, volatile, and severely under-margined swap positions posed potentially catastrophic risk to [Credit Suisse].

[Emphasis added].

134.    The Credit Suisse report further identified the presence of "numerous red flags," notably "relating to the size, concentration, and liquidity of Archegos's portfolio."  Concerns had escalated within Credit Suisse's Credit Risk Management as to the fact that "Archegos's

concentrated positions with [Credit Suisse] were **_likely also spread across its other prime_** **_brokers_**", namely Defendant Morgan Stanley, Defendant Goldman Sachs, Deutsche Bank (BNP Paribas), Jefferies, Nomura, Wells Fargo, and UBS.  [Emphasis added].

135.    Moreover, by February 2021, Credit Suisse had determined that because these other Prime Brokers were permitted to ask for more margin as Archegos's portfolio grew ever riskier, Archegos was in danger of facing margin calls it could not meet, which could trigger a liquidation.

136.    On top of all this, the Credit Suisse report identified other, well-known flags regarding Archegos.  For instance, "[r]isk is managed by Bill Hwang on a daily basis and is not segregated from his portfolio management responsibilities.  The risk management process at Archegos is informal, with Bill monitoring the volatility and liquidity of the portfolio.  There are no documented guidelines for individual position size, but informal limits are maximum long and short positions capped at 10% of capital (at cost).  Stop loss measures are not used by the trading desk.  There is no stress testing applied to the portfolio and in-house developed systems are used to manage risk."

137.    Credit Suisse's risk management team was aware of all of this information, but its sales team would not stop the relationship with Archegos because the fees were too great.

138.    Just so, Defendants and the other Prime Brokers were not deterred by the foregoing MNPI and red flags, but rather treated it as an opportunity to continue transacting in the Issuers' shares and profiting therefrom.

### 2.    *Additional MNPI Defendants Received from Archegos During the Week of March 22, 2021, Preceding Its Imminent Collapse*

139.    Over the course of 2020 and early 2021, and prior to the week of March 22, 2021, Defendants and the other Prime Brokers received the MNPI detailed in the preceding Subsection from Archegos indicating that it was a tinder box which could undercut the Issuers' stock prices.

Then, during the week of March 22, Defendants and the other Prime Brokers received a series of additional, new and escalating MNPI indicating: first that Archegos was having to scramble to meet escalating margin calls from its Prime Brokers, then that it was unable to meet those margin calls, next that simply selling certain of Archegos's collateral would be insufficient to cover its margin calls and other obligations, and finally that Archegos's collapse was imminent and the positions it controlled in the Issuers' stocks would be liquidated in some manner.

140.    More specifically, as set forth above, prior to the week of March 22, 2021, several of the Issuers' stock were already under pressure. Archegos was facing calls to provide additional margin from its Prime Brokers, while trying to use whatever resources it could to defend those stock prices by adding additional long positions and resorting to other manipulative techniques.

141.    On Monday, March 22, after market close, ViacomCBS announced a $2 billion secondary public stock offering. Defendant Morgan Stanley was the lead underwriter for that offering, and Defendant Goldman Sachs was an underwriter as well. As the *New York Times* reported, they were counting on Archegos to be the anchor investor that would buy at least $300 million of the shares in the offering.

142.    On the news of the offering, the next day, March 23, the price of ViacomCBS's stock dropped considerably.

143.    In response to this substantial drop, Archegos attempted to defend the price of ViacomCBS stock by executing an extraordinary amount of trading on March 23 – at least hundreds of millions of dollars' worth. Archegos was attempting to overpower the market to prevent the collapse of artificially inflated prices and ultimately, avoid margin calls. This gambit failed, and by the end of March 23, Archegos's capital plummeted from $36.2 billion to $32.7 billion.

144.    The Issuer stock where Archegos's positions were most concentrated continued to fall precipitously on March 24, 2021.  ViacomCBS's announcement that it had priced its offering at $85 per share – below the prior day's $100.34 closing price – triggered further losses in ViacomCBS, as well as in Discovery.

145.    At the same time, Archegos's holdings in China-based issuers like Gaotu, IQIY, Baidu, and Tencent also declined following the announcement of the adoption of interim amendments implementing the Holding Foreign Companies Accountable Act.  This announcement put pressure on the price of ADRs of Chinese issuers which comprised the balance of Archegos's concentrated positions.

146.    And yet, Archegos refused to unwind its concentrated positions to generate cash. To the contrary, over the course of March 24, it directed hundreds of millions of dollars of additional trading in those same positions in a fleeting effort to defend these stock prices.

147.    These desperate transactions on March 23 and 24 combined to deplete Archegos's cash reserves, even as its Prime Brokers issued escalating margin calls due to its deteriorating positions.  By the end of the day on March 24, 2021, the value of Archegos's capital declined to $16.9 billion – a one-day loss of 48%.

148.    Although Archegos managed to meet the $2.5 billion of margin calls that were due on March 24, it received another $10.7 billion worth of margin calls that day, which were due on March 25, and which it could not meet.

149.    At the same time, between March 22, when the ViacomCBS secondary offering was announced, and the morning of March 24, when it closed, Archegos changed plans and withdrew its participation in the offering.  This resulted in the offering raising much less money than it had targeted.  In turn, investors who participated in the offering and received larger-than-

expected stakes in it were disappointed by its poor performance and began selling their shares, driving ViacomCBS' stock price down further.  Defendants, as Archegos's Prime Brokers and the offering's underwriters, knew of Archegos's faltering position, its importance to the offering, and its withdrawal which undercut the offering, but, as the *New York Times* reported, frustrated ViacomCBS executives did not have any of that knowledge.

150.    After the market closed on March 24, having exhausted nearly all its excess cash, Archegos began informing Defendants Morgan Stanley and Goldman Sachs, along with its other Prime Brokers, that it would not be able to meet the margin calls due the next day, which was further MNPI and new detail that Defendants and the other Prime Brokers received regarding Archegos's collective exposure across the Prime Brokers and its liquidity.

151.    As detailed below, in an effort to meet its margin calls, on March 25, at the urging of Defendants, Archegos sold some of its positions, through block trades arranged by Morgan Stanley and Goldman Sachs, in an attempt to raise sufficient capital to meet its obligations.[3]  But this too failed and Archegos's positions deteriorated further.  By the end of the day, Archegos's capital was reduced to $9.2 billion, an additional 46% loss from the previous day, triggering a flood of additional margin calls.

152.    Also during the day on March 25, Archegos continued to have individual discussions with its Prime Brokers.  As the Credit Suisse report recounts, in those discussions, Archegos claimed it was "committed to making all [Prime Brokers] and swap counterparties whole by liquidating assets to cover the shortfall with each dealer," and observed that it would need to

---

[3]    Bloomberg Originals: Quicktake, *How to Lose $20 billion in Two Days*, Youtube (Aug. 10, 2021), https://www.youtube.com/watch?v=MhMhg97fmzE,  at 2:16 : "Very early on, Goldman emerged as a seller of almost $10 billion of securities on a Friday, dumping stock into the market in a way that was exceedingly rare, almost unprecedented. And any time I see the name Goldman Sachs I'm always curious. And so, I went down the Goldman Sachs rabbit hole and found out some interesting details about Goldman's relationship with this firm Archegos and the man behind it, Bill Hwang."

"carefully liquidate positions in order to not tip the market."  Along with the failure of the block trades to raise sufficient capital, this was yet additional MNPI and new detail that Defendants and the other Prime Brokers received regarding Archegos's collective exposure across the Prime Brokers and its liquidity.

153.    Left with no alternative, and in an attempt to thwart a large scale liquidation that might exacerbate stock price declines, Archegos organized a group call with its largest Prime Brokers, including Defendants Morgan Stanley and Goldman Sachs, after the market closed on March 25.  During that call, Archegos informed Defendants and the other Prime Brokers that while it had $9-$10 million billion in equity, it also had $120 billion in gross exposure, more specifically $70 billion in long exposure and $50 billion in short exposure.  Archegos also asked Defendants and the other Prime Brokers to enter into a standstill agreement whereby they would agree not to declare Archegos in default while it wound down its positions in an orderly manner.  This too provided Defendants and the other Prime Brokers with additional MNPI and new detail regarding Archegos's collective exposure across the Prime Brokers and its liquidity.

154.    An event of default, or early termination right, can apply to TRS or shares acquired through margin lending.  It applies when, among other things, the client fails to make a required payment to the prime broker, including for margin or collateral.  Once an event of default is triggered, the prime broker has the right to seize and sell the client's margin or collateral to cover any of the client's outstanding payments or obligations, and to unwind its transactions with the client.  An event of default does not permit prime brokers to engage in insider trading of their proprietary hedged shares based on MNPI.

155.    Between later in the evening of March 25 and the morning of March 26, a number of the Prime Brokers, including Defendants, triggered events of default or early termination rights

against Archegos.  As detailed below, on March 26, Defendants Morgan Stanley and Goldman Sachs rushed to sell very large amounts of the Issuers' stock, both their proprietary hedged shares and Archegos's collateral.  However, a number of the Prime Brokers did not do so, and suffered massive losses.

156.    The group discussions between Archegos, Defendants Morgan Stanley and Goldman Sachs, as well as the other Counterparties continued on March 27, 2021.  Archegos again requested a forbearance agreement.  The Prime Brokers separately discussed the possibility of a managed liquidation of Archegos related positions, overseen by some neutral party other than Archegos.  In addition, the Prime Brokers' general counsel held a separate call to discuss these possibilities as well, including their regulatory implications.  Defendants Morgan Stanley and Goldman Sachs did not agree to join a managed liquidation on or after March 27, as they had already sold the overwhelming majority of their Archegos related positions.  Considering the highly confidential, material, and non-public nature of these discussions, internal counsel for Defendants Morgan Stanley and Goldman Sachs, as well as for the other Counterparties, were present and read a script making clear that none of them were permitted to disclose their specific Archegos related positions.

157.    In an article on Archegos's collapse, the *Wall Street Journal* reported that such group meetings involving an investment firm like Archegos and its Prime Brokers is extremely unusual and has happened only a few times in recent memory.  Indeed, by their nature, they involve the exchange of MNPI and market timing or coordinated activity.

158.    All of this information constituted MNPI which Defendants Morgan Stanley, Goldman Sachs, and other Counterparties were made privy to during a confidential call in the context of their contractual relationship with Archegos.  In other words, had Defendants Morgan

Stanley and Goldman Sachs not entered into prime brokerage agreements with Archegos, they would never have obtained such MNPI from Archegos. Accordingly, Defendants Morgan Stanley and Goldman Sachs had a fiduciary duty towards Archegos to keep this MNPI confidential.

### B. Archegos Provided the MNPI to Defendants for Personal Benefit

159. As detailed above and throughout, Archegos received or anticipated receiving an array of possible personal benefits, direct or indirect, as a result of or in relation to its disclosure to Defendants of the MNPI at issue here. None of these benefits to Archegos held any advantage or served any purpose for the Issuers or their shareholders, to whom Archegos was duty bound not to disclose the MNPI – in fact, the benefits to Archegos were detrimental to the Issuers. The personal benefits to Archegos include, but are not limited to, the pecuniary benefits it received or anticipated receiving in connection with its swap investments, block trading, margin limits, and other aspects of its market manipulation scheme, including maintaining the artificially inflated Issuers' stock prices, which scheme was dependent on Defendants Morgan Stanley and Goldman Sachs providing it with prime brokerage services, such as trading, serving as a swap counterparty, and margin lending that enabled and facilitated Archegos's trading and manipulation. In exchange for providing these services, notwithstanding that awareness of the immense risks and illicit conduct Archegos was perpetuating, Archegos paid Defendants substantial fees.

160. Among the array of personal benefits that Archegos received or anticipated receiving are the direct or indirect actual pecuniary gains obtained in connection with its swap investments, block trading, margin limits, extra transacting capacity, and other aspects of its market manipulation scheme. This included the investments gains and losses avoided in connection with the stock price increases in the Issuer stocks, the corresponding daily appreciation across Archegos's long TRS positions, the increased margin payments Defendants made and would make to Archegos while its market manipulation scheme continued, as well as the increased

margin limits thereby made available to Archegos, as a result of the stock price increases and increased margin payments made by Defendants, which Archegos used to undertake further transactions and maintain the inflated prices of the Issuers' stock.

161.    Further, Archegos's scheme depended on remaining in the good graces of Defendants (and other Counterparties) who provided the critical and confidential services discussed above on which its scheme depended.  As the size of Archegos's portfolio and manipulation scheme expanded, it began to approach the limits of its swap Counterparties' risk management tolerances, and certain Counterparties, for example, initially refused to allow Archegos to execute additional long TRS positions in concentrated names; others refused to allow such transactions without the positing of additional margin. Archegos engaged in an unrelenting search for additional trade capacity in its concentrated positions to maintain its manipulation scheme and inflated prices. To that end, Archegos spoke daily with Defendants about increasing its notional limits in Issuer securities, who repeatedly agreed to grant Archegos additional capacity, including to enter into long TRS positions.

162.    Other personal benefits that Archegos received or anticipated receiving in connection for disclosing MNPI to Defendants included enhancing its connections to Defendants, so as to secure future advantages for its investments, investment strategy and market manipulation scheme, such as by developing or maintaining business contacts or access to markets or services facilitated by or through Defendants themselves, and by enhancing Archegos's reputation in order to develop or maintain other business contacts, or access to markets or services facilitated by others than Defendants, which was necessary to sustain Archegos's business and manipulation.

163.    Also among the array of personal benefits that Archegos received or anticipated receiving were its intent to benefit or hope to curry favor with Defendants and other prime brokers

and swap counterparties whose access to exclusive markets, professional discretion, and positions of expertise were seen by Archegos as necessary and beneficial to its own investment strategy and market manipulation scheme. The maintenance of these relationships with and services enabled by Defendants were necessary and beneficial to Archegos's ability to trade confidentially and thereby avoid both the stigma associated with Hwang and Tiger Asia's past misconduct, and the regulatory scrutiny and disclosure regime that otherwise come with investing directly in the underlying Issuer securities. Archegos was thereby able to access exclusive block trading and other markets that would not otherwise be available without its relationships with and the imprimatur of Defendants.

164. Further, as Archegos's market manipulation scheme became increasingly tenuous during the Class Period, including during the week of March 22, 2021, Archegos continued to provide MNPI, and to reap the benefits of its favorable relationships with Defendants by previously providing them MNPI and outsized fees to delay or avoid notices of default, to increase the likelihood of an organized winddown among its Counterparties, and otherwise delay or mitigate the negative financial, regulatory, and reputational fallout and consequences of its collapsing market manipulation scheme.

165. The array of personal benefits to Archegos arose in relationships of confidence and exclusivity with Defendants that afforded Defendants the opportunity and incentive of market-neutral fee generation, and substantial fees from the numerous transactions Archegos's scheme required, including transactions that Defendants knew were extremely risky and were generating anomalous market results, which Defendants only permitted after securing very high margins or collateral. The continuation of Defendants' substantial fees depended on Archegos being able to keep its market manipulation scheme going. These circumstances and the relationship between

Archegos's personal benefits and Defendants' fees indicates a *quid pro quo* between Archegos and Defendants.

### C.    Archegos Also Expected Defendants to Trade on the MNPI

166.    As detailed above and throughout, in connection with Archegos's disclosure to Defendants of MNPI, Archegos expected, or should have expected, that Defendants would trade on it. Defendants Morgan Stanley and Goldman Sachs are among the largest investment banks in the world. While diversified, nearly every aspect of Defendants' businesses involves trading securities. Moreover, the prime brokerage and block trading services that Defendants provided in confidence to Archegos necessarily involved trading of certain types of collateral securities for Archegos, including for Archegos to satisfy its obligations to Defendants.

167.    Furthermore, Archegos understood that industry practice for the TRS strategy it undertook typically involved Defendants and other Counterparties hedging, including by Defendants purchasing the Issuer stock referenced in the TRS positions taken by Archegos. While Archegos may not have fully known the precise extent and nature of each of Defendants' particular hedging strategies, the Archegos market manipulation scheme depended on some trading of Issuer shares referenced in the TRS to increase the market price of the Issuers' stock, including to some extent through Defendants' and other Counterparties purchasing proprietary hedged shares of the Issuers' stock. As its market manipulation scheme neared the precipice of collapsing during the Class Period, Archegos specifically contacted Defendants during the week of March 22, 2021, to provide them with that MNPI, and to request that Defendants delay a default, coordinate a managed winddown, and otherwise coordinate the trading it anticipated might occur by Defendants, so as to maintain the best prices possible for the Issuers' stock. As such, in connection with Archegos's disclosure to Defendants of MNPI, Archegos expected, or should have expected, that Defendants were positioned to likely trade the Issuers' stock.

IV.  **CONSISTENT WITH THEIR HISTORY OF INSIDER TRADING, DEFENDANTS TRADED ON THE MNPI HERE, FRONT-RUNNING THE MARKET AND SELLING THE RELEVANT SECURITIES BEFORE OTHERS LEARNED OF ARCHEGOS'S IMPENDING COLLAPSE**

168.    While in possession of the MNPI they received from Archegos, Defendants Morgan Stanley and Goldman Sachs rushed to unload billions of dollars of the Issuers' stock, consisting largely of their proprietary hedged shares, before news of Archegos's collapse and its immense concentrated portfolio that would have to be liquidated was made public.

   A.  **Overview of Defendants' Holdings in the Issuers' Stocks Shortly Before and Archegos's Collapse**

169.    As set forth above, when Defendants served as Counterparties to Archegos's TRS in the Issuers' stock, they acquired the stock referenced in those TRS as their own proprietary hedged shares.  Defendants publicly filed Form 13Fs each quarter, which showed the amount of the Issuers' stock that they held that period, among other things.

170.    Comparing Defendants' Form 13F holdings in the Issuers' stock for the quarter ending on December 31, 2020 ("4Q 2020"), to the quarter ending March 31, 2021 ("1Q 2021"), shows the enormous amount of the Issuers' stock that Defendants had acquired as their own proprietary hedged shares leading up to Archegos's collapse in late March 2021, and the massive amount of their proprietary hedged shares that they rapidly unloaded as it collapsed, when they were among a small set of prime brokers who knew what was happening based on the MNPI.

171.    For Defendant Goldman Sachs, this comparison of Form 13F data shows that it:

- Held 13,194,452 shares of Vipshop worth $370,896,000 at the end of 4Q 2020; and had **sold 69%** of those shares by the end of 1Q 2021, leaving it with only 4,139,630 Vipshop shares worth $123,609,000.

- Held 24,167,616 shares of Tencent worth $464,985,000 at the end of 4Q 2020; and had **sold 92%** of its shares in Tencent by the end of 1Q 2021, leaving it with only

1,908,864 shares worth $39,113,000.

- Held 7,871,441 shares of ViacomCBS worth $293,290,000 at the end of 4Q 2020; and had *sold 37%* of its shares in ViacomCBS by the end of 1Q 2021, leaving it with only 4,959,058 shares worth $223,654,000.

- Held 24,780,889 shares of IQIYI worth $433,170,000 at the end of 4Q 2021; and had *sold 88%* of its shares in IQIYI by the end of 1Q 2021, leaving it with only 3,000,000 shares worth $3,099,000.

- Held 20,611,675 shares of Gaotu worth $1,065,830,000 at the end of 4Q 2020; and had *sold 82%* of its shares in Gaotu by the end of 1Q 2021, leaving it with only held 3,661,431 shares worth $124,049,000.

- Held 2,650,122 shares of Baidu worth $573,062,000 at the end of 4Q 2020; and had *sold 74%* of its shares in Baidu by the end of 1Q 2021, leaving it with only 688,878 shares worth $149,865,000.

- Held 2,224,063 shares of Discovery worth $66,922,000 at the end of 4Q 2020; and had *sold 78%* of its shares in Discovery by the end of 1Q 2021, leaving it with only 482,441 shares worth 20,967,000.

172.    In summary, just before Archegos collapsed, Goldman Sachs held a combined 95,500,258 shares of the Issuers' stock, and as Archegos was collapsing, it sold *over 80%*, or 76,659,956, of those shares.

173.    Likewise, for Defendant Morgan Stanley, this comparison of Form 13F data shows that it:

- Held 43,323,357 shares of Vipshop worth $1,217,820,000 at the end of 4Q 2020; and had *sold 86%* of its shares in Vipshop by the end of 1Q 2021, leaving it

with only 6,260,673 shares worth $186,944,000.

- Held 45,398,723 shares of Tencent worth $873,471,000 at the end of 4Q 2020; and had ***sold 92%*** of its shares in Tencent by the end of 1Q 2021, leaving it with only 3,669,971 shares worth $75,198,000.

- Held 38,732,100 Class B shares of ViacomCBS worth $1,443,158,000 at the end of 4Q 2020; and had ***sold 99%*** of its shares in ViacomCBS by the end of 1Q 2021, leaving it with only 249,305 shares worth $11,244,000.

- Held 30,902,313 shares of IQIYI worth $540,172,000 at the end of 4Q 2020; and had ***sold 90%*** of its shares in IQIYI by the end of 1Q 2021, leaving it with only 3,107,990 shares worth $51,655,000.

- Held 13,684,143 shares of Gaotu worth $707,607,000 at the end of 4Q 2020; and had ***sold 57***% of its shares in Gaotu by the end of 1Q 2021, leaving it with only 5,904,932 shares worth $200,059,000.

- Held 4,378,854 "Rep A" shares of Baidu worth $946,883,000 at the end of 4Q 2020; and had ***completely liquidated*** – *i.e.,* sold 100% – of its holdings in Baidu.

- Held 7,831,986 "Series A" shares of Discovery worth $235,664,000 at the end of 4Q 2020; and had ***completely liquidated*** – *i.e.,* sold 100% – of its holdings in Discovery.

174.    To summarize, just before Archegos collapsed, Defendant Morgan Stanley held 184,251,476 shares of the Issuers' stock, and as Archegos was collapsing, it sold ***90%***, or 165,058,605, of those shares.

175.     These transactions, by which Defendants Morgan Stanley and Goldman Sachs traded on and exploited MNPI in breach of duties owed the shareholders of the Issuers and based on tips from Archegos to avoid billions in losses, are further detailed below.

**B.     Defendants' Sales of the Issuers' Stock in the Week Following March 22, 2021**

176.     As detailed above, by the week of March 22, 2021, the Issuers' shares had already been under pressure for some time, and over the first three days of that week ViacomCBS and several of the Chinese companies had further substantial stock price drops.

177.     By the morning of March 25, 2021, Defendants had already received the MNPI that, after dropping prices in the Issuers' stock and escalating margin calls from its Prime Brokers, Archegos no longer had sufficient cash to meet those calls.

178.     In response, as reported by the *Wall Street Journal* and *CNBC*, Defendants Morgan Stanley and Goldman Sachs held discussions with Archegos which resulted in Archegos agreeing to have Defendants sell certain of its collateral in an attempt to raise sufficient cash to meet its margin calls.

179.     Thus, on March 25, Defendant Morgan Stanley conducted a block sale of Archegos's collateral shares worth approximately $5 billion.  Defendant Goldman Sachs conducted a block sale of that collateral the same day as well.  These block sales included shared of Tencent, Baidu, and IQIYI.  The purchasers in those block sales, who were not informed of the MNPI by Defendants, later stated that they felt betrayed as the stock prices continued to drop the following days as Defendants sold even more stock.

180.     The March 25 block sales did not raise sufficient capital for Archegos to meet its obligations, and, by the end of the day, following a group call between Archegos and the Prime Brokers at which an orderly liquidation was discussed and with prices continuing to fall,

Defendants Morgan Stanley and Goldman Sachs had triggered events of default and early termination rights against Archegos.

181.    This led, on March 26, 2021, to Defendants Morgan Stanley and Goldman Sachs unloading an extraordinary amount of the Issuers' stock in a single day – which in combination totaled almost $20 billion worth.

182.    As multiple news outlets including *CNBC* and *Bloomberg* reported, Defendant Goldman Sachs, by itself, liquidated approximately $10.5 billion worth of the Issuers' stocks in block trades over the course of March 26 that included shares of: Baidu, Tencent, Vipshop ViacomCBS, Discovery, Farfetch, IQIYI, and GSX.  Based on Goldman Sachs's Form 13F data set forth above, these sales largely consisted of its proprietary hedged shares.

183.    The news outlets reported that Defendant Morgan Stanley made similar block sales of the Issuers' stock on March 26 totaling over $8 billion, with one exception discussed below: ViacomCBS.  Here too, based on Morgan Stanley's Form 13F data set forth above, these sales largely consisted of its proprietary hedged shares.

184.    *Bloomberg* further explained that Defendants' block trades on March 26 were abnormal, due to their size, with some exceeding $1 billion, and the fact that several of them hit during normal trading hours.

185.    Significantly, the *Wall Street Journal* recounted that in the group calls among Archegos' Prime Brokers during the week of March 22, Credit Suisse and Nomura suggested working together over a month to unwind Archegos's trades.  But Defendants "***Morgan Stanley and Goldman Sachs balked at even the idea of doing so, saying that within a day or two the market would get wind of the amount of stock that needed to be sold and pummel them***."

[Emphasis added].  That is, Defendants' express strategy with their trades during the week of March 22 was to front run the market based on the MNPI.

186.    On March 28, 2021, following another group meeting with Archegos and the other Prime Brokers the previous day, Defendant Morgan Stanley sold 45 million shares of ViacomCBS in block trades totaling about $2.5 billion – again, primarily its own proprietary hedged shares. Morgan Stanley later confirmed that, because it was the lead underwriter on ViacomCBS' secondary offering, and that offering was closing on March 26, it held off on dumping its proprietary hedged ViacomCBS shares until days later.  But its massive March 28 block sales still undercut the price of the ViacomCBS secondary shares it underwrote, not to mention that Morgan Stanley encouraged this secondary offering go forward even though it had a variety of MNPI indicating that there was about to be a wave of selling from itself and other prime brokers undercutting the offering price.  It is also notable that Defendant Goldman Sachs, another underwriter of this secondary offering, sold a smaller percentage of its ViacomCBS proprietary hedged shares on March 26 than any of its other holdings in the Issuers' stock.

187.    Defendant Morgan Stanley continued to sell several of its remaining smaller positions in the Issuers' stock on March 29, 2021, as well.

188.    As a result of Defendants' nearly unprecedented selling during the week of March 22, much of which was at discounts, the price of the Issuers' stock plummeted at a time when there was no other relevant market news.  This caused substantial harm to the Class.

189.    But Defendants' rapid selling on MNPI that week let them emerge essentially unscathed.  Defendant Goldman Sachs stated that it experienced no material losses from those sales or its proprietary holdings in the Issuers' stock.  Defendant Morgan Stanley faced about $10 billion in losses from Archegos's collapse as the Prime Broker with whom Archegos' placed the

most transactions.  Yet it had less than $1 billion in losses from its sales the week of March 22 and proprietary holdings in the Issuers' stock – and most of those losses were because it held off on selling its ViacomCBS proprietary hedged shares until March 28, as opposed to selling them with the rest of its block trades on March 26.  Morgan Stanley's CEO described those losses as immaterial compared to the $40 billion in revenue it had generated over the last decade from its prime brokerage services, which he characterized as a "gem of a business."

190.    By contrast, Prime Brokers Credit Suisse and Nomura, who did not rush to unload their proprietary hedged shares of the Issuers' stock during the week of March 22 and continued to hold much of those shares into April 2021, suffered enormous losses – over $5 billion and $3 billion respectively.  That is because the Issuers' stock prices had already dropped substantially by the end of March 26, and they continued to drop later in March and April as the MNPI was finally made public.  So, as Defendants had stated during the Prime Brokers' group meetings, by the time Credit Suisse and Nomura sold their proprietary shares, it was too late to font run the market.

191.    On an April 2021 conference call regarding its Q1 2021 performance, Defendant Goldman Sachs stated with respect to Archegos's collapse, that it "got this one right."   It elaborated:

> We have robust risk management that governs the amount of financing we provide for these types of portfolios.  Our risk controls, all of which were put in place long before the March events worked well.  We identified the risk early and took prompt action consistent with the terms of our contract with the client.
>
> *       *       *
>
> And so what David was describing, particularly around Archegos, the story is less about the events of Archegos as much as how we're set up to monitor it. And so we look at consolidated or overly consolidated concentrated positions in individual accounts.  We look for excessive position concentration across the whole of our business.   We look and undertake a daily mark-to-market on collateral and corresponding margin.  And in tracking concentration and correlation, we adjust what it is that we're doing, the level of margin we take, the clients we take in, the

pricing we put against that prime.

192.    In other words, Defendant Goldman Sachs conceded that it knew of the substantial risks posed by Archegos and engaged in front running on MNPI to avoid suffering any losses from them – which enabled it to keep the fees it had received from facilitating Archegos's manipulative trading as profits.

193.    Similarly, Defendant Morgan Stanley stated on its April 2021 conference call regarding its Q1 2021 performance, "[w]e cauterize bad stuff and deal with it as soon as we possibly can" with respect to its rapid unloading of stock related to Archegos.  Morgan Stanley also noted that this situation:

> was complicated . . . by the fact that one of the large single stock positions related to a security in which we have been an underwriter, and we thought the right thing to do was to close that previous underwriting which happened on that Friday.  So we had to hold off, which caused us to be later than some, if you will.  And the reason for that was not that we weren't aware of what was going on.  We just felt we had an underwriting obligation to deal with.

## C.    Summary of Defendants' Tipper/Tippee Insider Trading

194.    As alleged herein, Defendants Morgan Stanley and Goldman Sachs committed fraudulent insider trading in violation of Sections 10(b), 20(A), and 20(a) of the Exchange Act and U.S. Securities and Exchange Commission Rule 10b-5(a) and (c), promulgated thereunder. Specifically, Defendants Morgan Stanley and Goldman Sachs employed a manipulative and deceptive device, scheme, and artifice to defraud that operated as a fraud and deceit by means of directly trading, in the securities of the Issuers, while in possession of MNPI obtained from Archegos and in breach of duties owed to the Issuers and their shareholders.

195.    Defendants Morgan Stanley and Goldman Sachs owed fiduciary duties and obligations arising from similar relationships of trust and confidence to the Issuers and their shareholders.  These duties were derivative of and assumed by receiving the MNPI alleged herein

from Archegos, while Defendants Morgan Stanley and Goldman Sachs knew or should have known that Archegos constituted a statutory, temporary, or constructive insider of each of the Issuers by means of Archegos's massive undisclosed beneficial ownership, outsized control over the outstanding share ownership, and manipulation of each Issuer, which Defendants facilitated.

196.    Defendants Morgan Stanley and Goldman Sachs knew or should have known that Archegos's positions by means of direct common stock or ADR holdings as well as TRS in each of the Issuers far exceeded both the 5% beneficial ownership thresholds of Section 13 and the 10% beneficial ownership thresholds of Section 16.  Indeed, Defendants further knew, or should have known, that Archegos had substantial common stock positions in the Issuers' stock, that its additional long TRS positions in those stocks placed its control of those stocks well beyond the disclosure thresholds, but that Archegos was using its TRS positions to avoid ever filing 13F Reports or disclosing its control over the Issuers.

197.    Defendants Morgan Stanley and Goldman Sachs further knew or should have known that Archegos's positions and effective exposures were far greater as a result of Defendants own hedging strategies, by which they purchased proprietary hedged shares corresponding to stock or ADR shares in the Issuers referenced in Archegos's TRS positions, but which multiplied the concentration, exposure, and market risk of Archegos's transactions and manipulative scheme. That risk was especially great to unsuspecting ordinary public shareholders, including shareholders of the Issuers' stock who, unlike Defendants, were completely unaware of Archegos's massive and highly leveraged positions, Archegos's consequent (yet undisclosed) status as a statutory, temporary, or constructive insider of each of the Issuers, and the outsized risk posed by Archegos's massive, highly-leveraged undisclosed positions – much less the rampant market manipulation scheme on which the whole house of cards was based.   All of this was MNPI of the Issuers that

Defendants knew or should have known was in Archegos's possession and was provided by Archegos exclusively to Defendants and the other Counterparties, but not to the Issuers, their shareholders, or the marketplace.

198.    Defendants Morgan Stanley and Goldman Sachs knew, or should have known, that Archegos, as an undisclosed corporate insider of each of the Issuers, had relationships of trust and confidence with the corporations themselves and the shareholders of the Issuers, and thus owed a duty to abstain from trading shares of the Issuers based upon MNPI they obtained by reason of their positions with respect to these corporation.  Defendants Morgan Stanley and Goldman Sachs knew, or should have known, that Archegos was an undisclosed insider as to the Issuers, and thus owed to each such Issuer and its shareholders a duty to abstain from trading in the Issuer's securities unless first disclosing that MNPI to the public.

199.    Defendants Morgan Stanley and Goldman Sachs knew, or should have known, that, in breach of its duties to the Issuers and their shareholders, Archegos was providing them with MNPI regarding the Issuers' stock, including the substantial risk posed to that stock from Archegos's large-leveraged positions in, control over and manipulation of that stock.

200.    Defendants Morgan Stanley and Goldman Sachs knew, or should have known, that Archegos received or anticipated receiving an array of possible personal benefits, direct or indirect, as a result from or in relation to its disclosure to Defendants of the material, non-public information at issue here, including, but not limited to: (1) the pecuniary benefits Archegos received or anticipated receiving in connection with its swap investments, block trading, margin lending, trading capacity; (2) the benefits of sustaining Archegos's market manipulation scheme, which scheme was dependent on and enabled and facilitated by Defendants' conduct and confidential prime brokerage, block trading, and margin lending relationship and services, for which

Defendants received substantial fees; (3) intangible benefits Archegos received or anticipated receiving in connection with obtaining, by means of its relationship with Defendants, future advantages in connection with its investments or investment strategy or market manipulation scheme, such as by developing or maintaining business contacts or access to markets or services facilitated by or through Defendants themselves; (4) the benefits to Archegos's reputation which enable it to develop or maintain business contacts or access to markets or services facilitated by or through prime brokers or TRS counterparties other than Defendants; and (5) the benefit to Archegos from an orderly and more advantageous liquidation of its positions following events of March 22, 2021.

201.    Defendants Morgan Stanley and Goldman Sachs also knew, or should have known, that Archegos expected them to trade the Issuers' stock on the MNPI because, among other things: (1) Archegos needed to Defendants to sell part of its collateral in order to raise money so that it could meet its margin calls and other Counterparty obligations; and (2) following the events of March 22, 2021, Archegos expected Defendants to participate sell the Issuers' stock in a manner that would preserve the highest prices for that stock.

202.    Having obtained MNPI as alleged herein from Archegos, while Defendants Morgan Stanley and Goldman Sachs knew, or should have known, that Archegos qualified as an insider that had breached fiduciary, statutory, or other similar duties of confidence or loyalty owned to the corporations and shareholders of the Issuers, Defendants Morgan Stanley and Goldman Sachs assumed fiduciary and similar duties to the corporations and shareholders of the Issuers to abstain and not trade while in possession of the alleged MNPI obtained from Archegos in breach of Archegos's duties as an insider.

## V.    DEFENDANTS ALSO MISAPPROPRIATED MNPI FROM ARCHEGOS, AND TIPPED PREFERRED CLIENTS ACHIEVING A "FADE" IN THE ISSUERS' STOCK PRICES

203.    Separate from the tipper-tippee insider trading misconduct discussed above, Lead Plaintiff pleads in the alternative that Defendants Morgan Stanley and Goldman Sachs also misappropriated confidential MNPI they received from Archegos for their own purposes, in breach of duties they owed to Archegos, the source of that MNPI, as set forth below.

204.    While Archegos provided MNPI to Defendants Morgan Stanley and Goldman Sachs to achieve certain personal benefits and with the expectation that certain trading on it would occur, Archegos did not desire, expect or give permission for Defendants to tip their preferred clients based on MNPI.  Nor did Defendants inform Archegos that they would be tipping their preferred clients based on MNPI.

205.    Nevertheless, on March 24, 2021, the trading volume spiked for each of the Issuer shares, far in excess of their median trading volume for Q1 2021.  For instance, that day: the trading volume for Vipshop spiked to 280% of its median volume for Q1 2021; IQIYI spiked to 357%; Tencent spiked to 321%; ViacomCBS spiked to between 238% and 476%; Discovery spiked to over 150%; and Baidu spiked to 108%.  On information and belief, this inordinate spike on the March 24 trading volume across each of the Issuers was reflective of front-running block and other large sales by Defendants Morgan Stanley and Goldman Sachs based on confidential MNPI that originated with Archegos, as well as sales by the preferred hedge fund clients tipped off by Pawan Passi and other employees of Defendants.  As an example, on March 24 Defendants conducted a large block trade of Discovery shares and the circumstances surrounding this block trade exhibited the tell-tale signs of the Morgan Stanley Fade front-running conduct under investigation by the SEC and DOJ.   Just before that block trade was priced, the market price of Discovery shares *dropped almost 14%*.  This phenomenon repeated before an additional block trade of

Discovery handled by Defendant Morgan Stanley and overseen by its employee Pawan Passi the very next day, when just before price of the block the market price for the stock **_dropped 7.2%_** from its intraday high to close at $57.75.   As detailed herein, these and other suspicious stock price declines just ahead of Issuer block trades are now the subject of a DOJ and SEC probe into how Defendants Morgan Stanley (including Pawan, its other involved employees, and hedge fund client and other participants) and Goldman Sachs, among others, handled and front-ran such trades.

206.    The next day, March 25, 2021, another block trade occurred, including of Discovery shares.  Defendant Morgan Stanley arranged the Discovery block trade from Archegos's collateral.  As noted in the preceding paragraph, the price of Discovery stock dropped sharply right before this trade priced, in another example of the Morgan Stanley Fade.  The tipping by Morgan Stanley was counter to Archegos's interests, as Morgan Stanley knew that Archegos was attempting to sell its collateral through this block trade to raise as much money as possible to meet its margin obligations.

207.    As noted above, following these and other block trades leading up to Archegos's collapse, the SEC's and DOJ's probe into block trading practices, including of Defendants Morgan Stanley and Goldman Sachs, and the prevalence of the Morgan Stanley Fade, accelerated.

208.    By February 16, 2022, federal investigators began focusing on trades carried out a day before the wider sell-off wiped out $35 billion from the value of Archegos's holdings.  That led to a wider inspection of multiple trades brought to market by Defendant Morgan Stanley, and whether its clients illegally profited from trading in advance of those transactions as well as scrutiny of Passi.  This was part of a larger sweep of financial institutions, where subpoenas asked about particular block trades, including some going back to 2019.

209.    A few days later, *Bloomberg* reported that Credit Suisse was trying to help the DOJ "build a case related to block trading against rivals Defendants Morgan Stanley and Goldman Sachs". The article goes on to add:

> Bloomberg reported last year that Credit Suisse, facing significant exposure, pushed for an agreement to hold off on rapidly unwinding the family office's portfolio. But the effort failed, and Credit Suisse was caught flat-footed ***as Morgan Stanley and Goldman Sachs moved faster to extinguish their exposures, setting off further price declines that spelled pain for banks left behind***.

[Emphasis added].

210.    On February 24, 2023, an article entitled, *Morgan Stanley Says Trading Probes Focus on Information Sharing*, reported that Defendant Morgan Stanley had "disclosed more detail about the probes into its trading business by US regulators that are examining the sales of large blocks of stock." The article went on to state that the investigations, by the SEC and the United States Attorney's Office for the Southern District of New York, were "focused on whether employees shared or used information regarding impending block transactions in violation of securities regulations."

211.    Specifically, Defendant Morgan Stanley disclosed in an annual report on Form 10-K filed with the SEC on February 24, 2023, that it had been:

> responding to subpoenas and other requests for information from the Enforcement Division of the U.S. Securities and Exchange Commission and the United States Attorney's Office for the Southern District of New York in connection with their investigations into various aspects of the Firm's blocks business, certain related sales and trading practices, and applicable controls (the "Investigations"). The Investigations are focused on whether the Firm and/or its employees shared and/or used information regarding impending block transactions in violation of federal securities laws and regulations. The Firm is continuing to cooperate with the Investigations and is responding to the requests. The Firm also faces potential civil liability arising from claims that have been or may be asserted by, among others, block transaction participants who contend they were harmed or disadvantaged including, among other things, as a result of a share price decline allegedly caused by the activities of the Firm and/or its employees, or as a result of the Firm's and/or its employees' failure to adhere to

applicable laws and regulations.  In addition, the Firm has responded to demands from shareholders under Section 220 of the Delaware General Corporation Law for books and records concerning the Investigations.

212.    This effectively confirmed that Defendant Morgan Stanley had put its employees Passi and Leisure on leave because of communications about impending block trades and client activity.

213.    Indeed, in December 2022, Passi and Leisure formally exited Defendant Morgan Stanley. They initially submitted resignations, but their notice period was cut short and departure accelerated over unwillingness to work closely with the bank through the probe, people with knowledge of the matter told *Bloomberg* at the time, as *Bloomberg* reported.  According to his BrokerCheck record, on November 21, 2022, Charles Leisure was fired from Morgan Stanley following allegations concerning his communications about block trade transactions and client activity.  An article entitled *Two Equity Bankers Lose Their Morgan Stanley Broker Licenses – U.S. Regulator*, reported that Passi and Leisure were "no longer registered as a broker with the Financial Industry Regulatory Authority (FINRA) as of Dec. 16, [2022]."  This indicates that they had lost their broker licenses as well.

214.    On May 2, 2023, a *Bloomberg* article reported that Defendant Morgan Stanley was looking to resolve the SEC and DOJ probe into its block-trading business.  Morgan Stanley disclosed in its Form 10-Q filed with the SEC that same day, that it was:

currently engaged in discussions regarding potential resolution of the investigations by the Enforcement Division of the [SEC] and the United States Attorney's Office for the Southern District of New York into various aspects of the Firm's blocks business, certain related sales and trading practices, and applicable controls. There can be no assurance that these discussions and continuing engagement will lead to resolution of either matter.

215.    Plaintiffs also plead in the alternative with respect to Defendants' Morgan Stanley's and Goldman Sachs's block trades during the week of March 22, 2021, that Defendants did not

disclose to Archegos the full extent of their massive unloading of proprietary hedged shares which took place on those days prior to the time those sales took place, as Defendants never informed Archegos of their precise amount of proprietary shares or their precise hedging strategy and there is more than one way to hedge TRS.

216.    Defendants Morgan Stanley and Goldman Sachs owed duties of confidence to Archegos pursuant to written and other express agreements governing the prime brokerage, margin lending, and other brokerage-client relationships entered into between each of Defendants Morgan Stanley and Goldman Sachs with Archegos.  Pursuant to these express agreements, Defendants Morgan Stanley and Goldman Sachs agreed to keep the MNPI alleged herein confidential and non-public, and thus Defendants Morgan Stanley and Goldman Sachs owed a duty to Archegos both to keep that MNPI confidential and not to misappropriate it for their own purposes.

217.    Defendants Morgan Stanley and Goldman Sachs also owed duties of confidence to Archegos based on the parties' history, pattern, practice, course of dealing, or relationship with regard to the prime brokerage, margin lending, and other brokerage-client relationships, services, and transactions between each of Defendants Morgan Stanley and Goldman Sachs and Archegos. Pursuant to their history, pattern, practice, or relationship, Defendants Morgan Stanley and Goldman Sachs had historically kept confidential and non-public the type of MNPI herein alleged to have been obtained from Archegos.  Based on that history, pattern, practice, course of dealing, or relationship, Defendants Morgan Stanley and Goldman Sachs knew or reasonably should have known or that Archegos did and would expect that Defendants Morgan Stanley and Goldman Sachs would maintain the confidentiality of the MNPI obtained from Archegos as alleged herein. Thus, Defendants Morgan Stanley and Goldman Sachs owed a duty to Archegos both to keep such MNPI confidential and non-public and not to misappropriate it for their own purposes.

218.    Defendants Morgan Stanley and Goldman Sachs also owed duties of confidence to Archegos based on their own corporate policies and practices with regard to the prime brokerage, margin lending, and other brokerage-client relationships, services, and transactions between each of Defendants Morgan Stanley and Goldman Sachs and Archegos.  Pursuant to their own prime brokerage, margin lending, and other corporate policies, and practices, Defendants Morgan Stanley and Goldman Sachs were required and expected to keep confidential and non-public the type of MNPI herein alleged to have been obtained from clients such as Archegos.  Based on their own corporate policies and practices, Defendants Morgan Stanley and Goldman Sachs knew, or reasonably should have known, that Archegos did and would expect that Defendants Morgan Stanley and Goldman Sachs would maintain the confidentiality of the MNPI obtained from Archegos as alleged herein.  Thus, Defendants Morgan Stanley and Goldman Sachs owed a duty to Archegos both to keep such MNPI confidential and non-public and not to misappropriate it for their own purposes.

219.    Defendants Morgan Stanley and Goldman Sachs also owed duties of confidence to Archegos pursuant to express agreements entered into between each of Defendants Morgan Stanley and Goldman Sachs with Archegos (as well as with the other Counterparties) in connection with Archegos's March 2021 non-public efforts to coordinate a collective standstill, forbearance of default and managed liquidation.  During a series of calls and meetings discussing this possibility, counsel for all Counterparties were engaged and attended these calls to work through regulatory and legal considerations, and legal counsel for Defendants Morgan Stanley and Goldman Sachs, and the other Prime Brokers further held calls among themselves.  Across the calls and meetings, representatives of Defendants Morgan Stanley and Goldman Sachs, and the other Prime Brokers, acknowledged and agreed to maintain the confidentiality of, and not disclose,

Archegos-related positions and other Archegos-related MNPI as alleged herein.  Pursuant to these express agreements, Defendants Morgan Stanley and Goldman Sachs agreed to keep the MNPI alleged herein confidential and non-public, and thus Defendants Morgan Stanley and Goldman Sachs owed a duty to Archegos both to keep that MNPI confidential and not to misappropriate it for their own purposes.

## VI.    THE FALLOUT FROM ARCHEGOS' COLLAPSE AND DEFENDANTS' INSIDER TRADING

220.    Archegos's fallout received wide media coverage in the days and weeks following the firm's remarkable liquidation for a number of reasons, including the fact that it involved several of the world's most powerful financial institutions.

221.    By April 8, 2021, Senator Sherrod Brown, Democratic chair of the U.S. Senate Banking Committee had written to several large banks, including Credit Suisse and Japan's Nomura – another of Archegos's Counterparties – asking them for information on their relationship with Archegos after the fund imploded the month before.  Senator Brown asked the banks' chiefs to detail how their institutions came to do business with Archegos.

222.    Just a few days later, Federal Reserve Chairman Jerome Powell gave an interview with 60 Minutes where he commented on the Archegos collapse, stating "I think what really happened is that [Goldman Sachs, Morgan Stanley, Credit Suisse and Nomura] did understand the risks that they were running," and that the collapse was the result of a "risk management breakdown."  Chairman Powell also commented that the Federal Reserve was taking a close look at the situation to prevent it from happening again.

223.    On April 6, 2021, the *Wall Street Journal* reported that Credit Suisse "is now in full crisis mode."  In order to "shore up capital" following its Archegos-related losses, Credit Suisse

would announce that it was suspending a share buyback program, and was paying a reduced dividend through a mix of capital and retained earnings, among other things.

224.    On April 12, 2021, a *New York Times* article disclosed that "[t]he S.E.C. has opened an informal inquiry into Archegos and the spillover effects of its collapse, which caused billions of dollars in losses at banks around the globe."

225.    In a letter dated April 17, 2021, hedge fund manager David Einhorn slammed the SEC for not noticing what he called the "real story" of the Archegos collapse, where the SEC should have noticed the unusual manipulative trading activity in Gaotu stock in its ongoing investigation of the company.

226.    Around April 21, 2021, Japan's finance minister indicated that the government was looking into the financial losses incurred by Nomura and Mitsubishi UFJ – both Archegos Counterparties – and that it would share information on the matter with the Bank of Japan and overseas authorities.

227.    On May 6, 2021, the *Wall Street Journal* reported that the SEC "[wa]s studying potential new rules" notably related to Archegos's implosion.

228.    Archegos's meltdown was also raised by United States Senator Elizabeth Warren (D-Mass.) during the *Semiannual Testimony on the Federal Reserve's Supervision and Regulation of the Financial System* – U.S. Senate Committee on Banking, Housing and Urban Affairs, during which she stated that "some of [the U.S.'s] biggest banks had loaned Archegos the money to make those bets, even though the hedge fund was managed by a guy who had already been charged with insider trading and banned by regulators from handling clients' money."

229.    On May 26, 2021, the DOJ announced that it was launching an investigation into the collapse of Archegos, sending requests for information to some banks that had worked with Archegos:

> Banks raced to sell off Archegos's[s] holdings in March after the family office made massive, highly leveraged bets on companies including ViacomCBS Inc. and was unable to meet margin calls as the positions soured. The episode contributed to losses for banks including Credit Suisse Group AG, Nomura Holdings Inc. and Morgan Stanley that had helped to finance the wagers through prime brokerage units, which lend money to hedge funds and other private investment firms.

> While authorities haven't accused Archegos or its banks of breaking any laws in their dealings, the episode has drawn public criticism from regulators, as well as some inquiries behind the scenes from watchdogs around the world.

> *        *        *

> The Securities and Exchange Commission launched a preliminary investigation into Hwang in March, a person familiar with the matter said at the time. The agency has since explored how to increase transparency for the types of derivative bets that sank the firm.

> And in the U.K., the Prudential Regulation Authority has been asking firms including Credit Suisse, Nomura and UBS Group AG to hand over information related to their lending to Archegos, people familiar with the matter have said.

230.    By June 24, 2021, a *Bloomberg* article reported that the DOJ was specifically examining how global banks handled multibillion-dollar trades with Archegos:

> The Justice Department's antitrust division is handling at least part of the probe into the collapse of Bill Hwang's firm ***after lenders rushed to liquidate souring positions in March***, according to people familiar with the matter. The debacle also erased much of the billionaire owner's fortune and saddled banks with more than $10 billion in losses.

> The division has been seeking information from Hwang's biggest backers on Wall Street, who had discussed the possibility of moving in concert to unwind the portfolio and sever ties with his busted family office, the people said, asking not to be identified because they aren't authorized to discuss the inquiries.

> [Emphasis added].

231.    In an article published on September 22, 2021, the *Wall Street Journal* described Archegos as "one of the biggest international financial disasters in a generation, unleashing sudden losses on banks in Switzerland, the U.S. and Japan."

232.    A few days later, in a September 24, 2021 speech, SEC Commissioner Caroline A. Crenshaw discussed the Archegos collapse as "a reminder of the potential damage such swaps could inflict when used for speculative purposes."

233.    By October 8, 2021, the SEC had served Archegos with a subpoena and announced its investigation of Archegos, probing the firm's trading activity, including whether it engaged in market manipulation and/or concealed the size of its bets on public companies.  The SEC also scrutinized whether Archegos bought multiple stakes in the same companies across several banks to avoid triggering public disclosure rules.

234.    On October 12, 2021, a securities class action was instituted against Defendants Goldman Sachs and Morgan Stanley on behalf of all those who purchased or otherwise acquired common stock of Vipshop, a leading online retailer for brands in China.  The complaint alleges that Defendants Morgan Stanley and Goldman Sachs collectively avoided billions in losses by selling Vipshop shares while in possession of material non-public adverse information.

235.    On October 20, 2021, a securities class action was instituted against Defendants Goldman Sachs and Morgan Stanley on behalf of all those who purchased or otherwise acquired ADSs of Gaotu, a leading online discount retailer for brands in China.  The complaint alleges that Defendants Goldman Sachs and Morgan Stanley collectively avoided billions in losses by selling Gaotu ADSs while in possession of material non-public adverse information.

236.    On October 26, 2021, a securities class action was instituted against Defendants Goldman Sachs and Morgan Stanley on behalf of all those who purchased or otherwise acquired

ADSs of Tencent, a leading online music and audio entertainment platform in China. The complaint alleges that Defendants Goldman Sachs and Morgan Stanley collectively avoided billions in losses by selling Tencent ADSs while in possession of material non-public adverse information.

237.    On October 29, 2021, a securities class action was instituted against Defendants Goldman Sachs and Morgan Stanley on behalf of all those who purchased or otherwise acquired common stock of ViacomCBS, a leading global media and entertainment company. The complaint alleges that Defendants Goldman Sachs and Morgan Stanley collectively avoided billions in losses by selling ViacomCBS shares while in possession of material non-public adverse information.

238.    On November 15, 2021, a *Bloomberg News* article announced that "French lender [BNP Paribas SA] last week agreed to take on the hedge fund clients of Credit Suisse Group AG after the Swiss bank decided to exit the so-called prime brokerage business in the wake of $5.5 billion in losses from a single relationship" and that "Nomura Holdings Inc. stopped offering cash prime-brokerage services in the U.S. and Europe after also losing billions of dollars in the Archegos blowup."

239.    On November 24, 2021, the U.S. Federal Reserve Board announced that "it found weak practices in banks with exposure to the $10 billion default of Archegos Capital Management earlier this year." Specifically:

> Providing a glimpse of its regulatory activities of major banks such as JPMorgan Chase & Co. (JPM), Wells Fargo & Co. (WFC), Goldman Sachs Group Inc. (GS) and Bank of America (BAC), the Fed[eral Reserve] said it would focus on trading and counterparty risk management, including areas such as concentrations, hedging and client leverage.

240.    On December 2, 2021, a securities class action was instituted against Defendants Goldman Sachs and Morgan Stanley on behalf of all those who purchased or otherwise acquired ADRs of IQIYI, a leading online discount retailer for brands in China. The complaint alleges that

Defendants Goldman Sachs and Morgan Stanley collectively avoided billions in losses by selling

IQIYI ADRs while in possession of material non-public adverse information.

241.    On December 9, 2021, a *Bloomberg News* article announced:

The U.S. Securities and Exchange Commission plans next week to release its plan for scrutinizing the kinds of complex stock derivatives transactions that fueled the collapse of Bill Hwang's Archegos Capital Management.

The SEC will propose new rules that mark the agency's biggest policy response yet to the Archegos debacle that blindsided the regulator earlier this year. The blow-up exposed the lack of visibility the Wall Street regulator has into security-based swaps transactions despite being required by Congress in 2010 to oversee the asset class.

*        *        *

According to a notice on the SEC's website, the agency on Dec. 15 will consider:

- Re-proposing a rule to prohibit fraud and manipulation tied to security-based swaps
- New rules focused on the conduct of chief compliance officers for security-based swaps dealers and major traders
- Requiring reporting of large security based swaps positions

*        *        *

In addition to the new derivatives rules, the agency is also planning to consider a slate of rules focused on money markets, stock buyback disclosures and insider trading.

242.    On December 15, 2021, the SEC proposed a slate of new rules to "to prevent fraud,

manipulation and deception in connection with security-based swaps, to prevent undue influence

over the chief compliance officer (CCO) of security-based swap dealers and major security-based

swap participants (SBS Entities), and to require any person with a large security-based swap

position to publicly report certain information related to the position."

243.    As indicated in a *Bloomberg* article published that same day, "[t]he proposal

represents the SEC's first major policy response to Archegos'[s] breakdown in March, which

triggered the sales of billions of dollars in equities and steep losses for major Wall Street firms involved in Hwang's trades."

244.    On December 16, 2021, a securities class action was instituted against Defendants Goldman Sachs and Morgan Stanley on behalf of all those who purchased or otherwise acquired common stock of Baidu, a Chinese multinational technology company specializing in Internet-related services and products and artificial intelligence.  The complaint alleges that Defendants Goldman Sachs and Morgan Stanley collectively avoided billions in losses by selling Baidu shares while in possession of material non-public adverse information.

245.    On January 7, 2022, a securities class action was instituted against Defendants Goldman Sachs and Morgan Stanley on behalf of all those who purchased or otherwise acquired Class A or Class C common Stock of Discovery, a mass media factual television conglomerate based in New York City.  The complaint alleges that Defendants Goldman Sachs and Morgan Stanley collectively avoided billions in losses by selling Discovery shares while in possession of material non-public adverse information.

246.    Also on February 25, 2022, a *Financial Times* article revealed that the China Securities Regulatory Commission "ordered [Defendant] Morgan Stanley to provide it with information on a US investigation into its block trading business."  China's securities regulator said it "was aware the US Securities and Exchange Commission had issued subpoenas to Morgan Stanley 'and other institutions' requesting data on block transactions" and asked Morgan Stanley to "'explain' reports about the SEC investigation."

247.    On March 1, 2022, the *Financial Times* reported that Archegos and global banks were discussing a potential out-of-court settlement to avoid a legal battle that would expose details of the deals that led to Archegos's implosion a year ago:

The talks to agree a truce come as financial watchdogs and the Department of Justice in the US have expanded a wide-ranging probe into apparent irregularities in Wall Street's lucrative practice of marketing large blocks of shares.

Authorities are examining whether banks broke rules when they negotiated the 'block trades' — the private sale of large quantities of shares to hedge fund clients — including during the failure of Archegos last year.

Morgan Stanley, which was heavily exposed to Archegos and was among the first to put large blocks of shares it held on behalf of the investor up for sale, disclosed last week that the Securities and Exchange Commission had been examining the bank's block trading business since 2019 and that the Department of Justice recently launched its own investigation.

248. The following day, on March 2, 2022, a *Bloomberg* article revealed that amid scrutiny from federal investigators on block trades, "Goldman Sachs Group Inc. is pulling back from at least one money manager [*i.e.*, Islet Management] whose communications have drawn interest from authorities."

249. As reported by *Bloomberg*, by March 2022, "all across Wall Street the knives [were] out for Morgan Stanley," including for its conduct with respect to the Morgan Stanley Fade.

250. On April 5, 2022, the *Wall Street Journal* revealed that "[i]nsiders at companies based in China but listed on a U.S. exchange avoided at least $10 billion in losses on trades made between 2016 and mid-2021 by selling stock ahead of significant price declines." Among these insiders are top executives at IQIYI and Vipshop, who respectively sold $125 million and more than $250 million worth of stock thereby avoiding market price drops over the next few months.

251. On April 27, 2022, the DOJ announced the unsealing of an indictment charging Hwang and Halligan, another Archegos executive, with racketeering, conspiracy, securities fraud, and wire fraud offenses in connection with interrelated schemes to unlawfully manipulate the prices of publicly traded securities in Archegos's portfolio. The DOJ also announced the unsealing of Archegos executives' Becker's and Tomita's guilty pleas in connection with their participation in the conspiracy.

252.    Also on April 27, 2022, the SEC and the CFTC each filed parallel civil actions related to the Archegos collapse.  The SEC complaint asked the court for permanent injunctive relief, return of allegedly ill-gotten gains, and civil penalties against Archegos, while also seeking to bar the individual defendants in its complaint from serving as public company officers or directors.

253.    As indicated in the SEC Complaint:

> ***To avoid reporting thresholds under Section 13(d) of the Exchange Act***, when Archegos approached stock holdings representing 5% of the shares outstanding of any particular issuer, it would generally ***shift from purchasing cash equity positions in that issuer to purchasing synthetic exposure to the issuer through [security-based swaps]***.

[Emphasis added].

254.    The SEC Complaint further alleges that Archegos, "through Hwang's decisions and Tomita's trading to execute on those decisions," engaged in manipulative trading.

255.    In April 2022, Hwang was charged by the SEC with racketeering conspiracy, securities fraud, market manipulation and wire fraud offenses "in connection with interrelated schemes to unlawfully manipulate the prices of publicly traded securities in Archegos's portfolio."

256.    In light of the foregoing, it is not surprising that several hedge fund managers told a *Barron's* journalist that they wonder whether a trial against Hwang and Halligan would show "that Wall Street brokers were making so much money from Archegos that the brokers ignored the obvious risks until Hwang's concentrated bets crashed":

> "Good for the Justice department and the SEC in going after Hwang," says a longtime hedge fund manager who has done business with most of the prime desks named in the indictment. ***"But did the bankers know? They had to know."***

[Emphasis added].

## SCIENTER

257.  As described above, Defendants Morgan Stanley and Goldman Sachs possessed MNPI at the time they engaged in the stock sales described herein.   Defendants Morgan Stanley's and Goldman Sachs's possession of this knowledge while trading demonstrates their scienter.  Specifically, Defendants Morgan Stanley and Goldman Sachs knew (*i.e.,* possessed the information), among other MNPI described herein, that:

- Archegos's massive, highly leveraged, and concentrated beneficial ownership positions in each of the Issuers, in excess of both the 5% beneficial ownership thresholds of Section 13 and the 10% beneficial ownership thresholds of Section 16 of the Exchange Act and the rules and regulations promulgated thereunder;

- Archegos structuring its investments in these companies pursuant to a TRS strategy specifically as a plan or scheme to evade the beneficial ownership reporting requirements of Sections 13 and 16 of the Exchange Act, and failing to disclose its positions in and control of the Issuers;

- By means of these non-public, massive, highly leveraged positions, and other tactics, Archegos had engaged in rampant market manipulation to distort and inflate the Issuers stock prices, such that the public prices for these shares did not reflect and were not the product of natural market forces of supply and demand, but rather were the artificial product of Archegos's manipulative trading and deceptive conduct;

- The exposure and significant risk posed by Archegos's massive and highly leveraged, positions in each of the Issuers, including through TRS, was

exacerbated by its Prime Brokers', including Defendants Morgan Stanley's and Goldman Sachs's hedging strategies, pursuant to which they purchased their own reciprocal proprietary hedged shares;

- The exposure and significant risk posed by Archegos's highly leveraged, non-public, positions in each of the Issuers had increased dramatically during the first quarter of 2021, and this risk was further heightened because they were all concentrated positions of Archegos, such that a price drop in any one of them could lead to sales and consequent price drops in all of them;

- Rather than stop Archegos's trading and cut-off their fees as the risks increased, Defendants simply increased margin requirements and similar terms, making transactions more expensive for Archegos, and Archegos nevertheless kept undertaking its many transactions that were atypical for investment firms, even as the Issuer's stocks continued to have price movements that were inconsistent with other market movements;

- By early January 2021, after repeated breaches of exposure limits, the ballooning risk posed by Archegos's positions led Defendants Morgan Stanley and Goldman Sachs, and other Counterparties to issue a series of escalating margin calls, demanding hundreds of millions of dollars in additional collateral from Archegos;

- By the week of March 22, 2021, Archegos's ability to cover these margin calls was all but exhausted when further declines across several of its significant long positions exacerbated its exposure, leading Defendants Morgan Stanley and

Goldman Sachs, and its other Counterparties, to demand billions of dollars in additional collateral from Archegos;

- Facing massive escalating margin calls it could not meet and a consequent and catastrophic liquidity crisis, Archegos informed Defendants Morgan Stanley and Goldman Sachs, and its other Counterparties, that it did not have the liquidity to meet any of their margin calls;

- Archegos had convened a series of calls, at least from March 25, 2021 through March 27, 2021, with the Counterparties, including Defendants Morgan Stanley and Goldman Sachs, informing them that while its equity had declined to less than $10 billion its aggregate exposure had ballooned to over $120 billion, and proposing that its Prime Brokers standstill or forbear on triggering events of default while it orchestrated a managed liquidation;

- Defendants Morgan Stanley and Goldman Sachs and Archegos's other Counterparties also held a series of calls and meetings to discuss the possibility of an orderly managed liquidation of the Issuers' shares; and

- By unloading their proprietary hedged holdings via block trades and other transactions across the very same underlying Issuers, Defendants Morgan Stanley and Goldman Sachs were doing so on unsuspecting and unwitting investors.

258. In addition, as set forth above, Defendants Morgan Stanley and Goldman Sachs also knew, were reckless in not knowing, or should have known that Archegos was a controlling shareholder and insider of the Issuers and that it owed duties to the Issuers and their shareholders, including not to disclose MNPI concerning the Issuers or to abstain from trading on it. Further

Defendants knew, were reckless in not knowing, or should have known that Archegos breached those duties to the Issuers and their shareholders by tipping that MNPI to them for personal benefits, more fully described above, and also when Archegos expected or should have expected Defendants to trade on that information as set forth above.

259.    These allegations strongly support the conclusion that Defendants Morgan Stanley and Goldman Sachs knew of and possessed the MNPI at the time they traded, and rushed to trade in order liquidate their Archegos-related positions and proprietary hedged shares before the market learned of that MNPI.

260.    In addition, Defendants Morgan Stanley and Goldman Sachs possessed the motive and opportunity to trade on the proprietary MNPI conveyed to them by Archegos.

261.    As a result of their market-neutral hedging strategies, Defendants Morgan Stanley and Goldman Sachs were several of the largest holders of the Issuers' stocks controlled by Archegos.  Defendant Morgan Stanley was the largest holder, with approximately $18 billion in positions overall.

262.    Credit Suisse held the second largest position in Archegos's top 10 stocks and suffered a $4.7 billion loss following Archegos's meltdown, when it did not rush to liquidate its positions based on MNPI.  Defendants Morgan Stanley and Goldman Sachs knew that they also had large exposure and were likely to suffer large losses if they did not trade on MNPI.  According to a *CNBC* estimate, Defendant Morgan Stanley would have suffered a $10 billion loss had it not done so.

263.    As alleged above, the Morgan Stanley Fade is a widely known phenomenon. Defendants Morgan Stanley and Goldman Sachs routinely participated in and benefitted from

transactions wherein observable price declines preceded block sales, based on Defendants' insider tipping and trading.

264.    As alleged above, the MNPI set forth above, including in connection with Archegos's impending collapse, was material precisely because of its potential market moving effects, which Defendants intentionally or recklessly exploited with their trading detailed above.

## LOSS CAUSATION

265.    Defendants Morgan Stanley and Goldman Sachs traded and sold their holdings of Baidu stock and the other Issuers' stock, including their proprietary hedged shares, which they knew had a substantially lower value than the then-prevailing market price based on the MNPI they had received.  By doing so and front-running the market, Defendants passed on the losses from that degraded stock to the Lead Plaintiff and the Baidu Investor Class, which losses Defendants thereby avoided.

266.    Additionally, Defendants Morgan Stanley and Goldman Sachs knew that when the risk of the MNPI materialized, including the risk of Archegos's impending collapse, the price of Baidu stock and the other Issuers' stock would drop substantially.  By trading on the MNPI without publicly disclosing it, as set forth above, Defendants concealed that risk from the market and Lead Plaintiff and the Baidu Investor Class, and thereby caused its losses when that risk materialized.

267.    Also, Defendants Morgan Stanley's and Goldman Sachs' trading on MNPI, as set forth above, itself harmed Lead Plaintiff and the Baidu Investor Class by driving down the price of the price of Baidu stock and the other Issuers' stock.

268.    Consequently, as a result of their purchases of Baidu stock during the Class Period, Lead Plaintiff and other members of the Baidu Investor Class suffered economic loss, *i.e.,* damages, under the federal securities laws.

## RELIANCE

269.    To the extent that reliance is an element of their claims, Lead Plaintiff and other members of the Baidu Investor Class are entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated upon omissions of material fact.  The allegations herein primarily allege omissions where there was an affirmative duty to disclose information.

270.    To the extent that reliance is an element of their claims, Lead Plaintiff and other members of the Baidu Investor Class are also entitled to a presumption of reliance on Defendants Morgan Stanley's and Goldman Sachs's omissions pursuant to the fraud-on-the-market theory:

a.    Baidu stock was traded on the New York Stock Exchange, both an informationally efficient market, throughout the Class Period;

b.     Baidu stock traded at high volumes during the Class Period;

c.    Public investors learned of information about Baidu stock through established market communication mechanisms, including through regular dissemination of press releases on the major news wire services, and through other wide-ranging public revelations, such as communications with the financial press, securities analysts, and other similar reporting services;

d.    The market reacted promptly to public information about Defendants' involvement in, and exposure to, Archegos's collapse;

e.    Baidu stock was covered by numerous securities analysts employed by major brokerage firms who wrote reports that were publicly available and entered the public marketplace;

f.    The material omissions alleged herein would tend to induce a reasonable investor to misjudge the value of Baidu stock; and

94

g.    Without knowledge of the omitted material facts alleged herein, Lead Plaintiff and the other members of the Baidu Investor Class purchased or otherwise acquired Baidu stock between the time Defendants Morgan Stanley and Goldman Sachs possessed and failed to reveal the material facts and the time the true facts began to reach the market.

## DEFENDANTS MORGAN STANLEY'S AND GOLDMAN SACHS'S UNLAWFUL LOSS AVOIDANCE

271.    As set forth above, Defendants Morgan Stanley and Goldman Sachs traded on and exploited MNPI in breach of duties owed to Archegos and the shareholders of the Issuers.

272.    As a result of these insider sales, Defendants Morgan Stanley and Goldman Sachs avoided billions in losses and/or had unlawful gains.

273.    Defendant Morgan Stanley was the biggest holder of the Issuers' stock traded by Archegos at the end of 2020, with about $18 billion in such positions overall.  As set forth above, it could have faced roughly $10 billion in losses had it not engaged in front running on MNPI, but by doing so only suffered a fraction of those potential losses.

274.    Likewise, Defendant Goldman Sachs faced large potential losses from its holdings of the Issuers' stock related to Archegos, including through its proprietary hedged shares, and, as set forth above, by front-running the market on MNPI completely avoided any material loss.

## CONTEMPORANEOUS PURCHASES AND SALES

275.    As set forth in previously filed certification, Lead Plaintiff traded Baidu common stock contemporaneously (within the meaning of Sections 10(b) and 20A of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t-1) with and opposite to Defendants Morgan Stanley's and Goldman Sachs's trades in of Baidu common stock during the Class Period.

## CLASS ACTION ALLEGATIONS

276.    Lead Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of a class (the Baidu Investor Class) consisting of all persons who purchased or otherwise acquired Baidu common stock contemporaneously with Defendants Morgan Stanley's and Goldman Sachs's unlawful trades during the Class Period. Excluded from the Baidu Investor Class are Defendants herein, the employees, officers and directors of Defendants Goldman Sachs and Morgan Stanley during the Class Period, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

277.    The members of the Baidu Investor Class are so numerous that joinder of all members is impracticable. During the Class Period, Baidu shares were actively traded on the New York Stock Exchange and millions of shares were issued and outstanding.  While the exact number of Baidu Investor Class members is unknown to Lead Plaintiff at this time and can be ascertained only through appropriate discovery, Lead Plaintiff believes that there are likely thousands of members in the proposed Baidu Investor Class.  Record owners and other members of the Baidu Investor Class may be identified from records maintained by Baidu or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

278.    Lead Plaintiff's claims are typical of the claims of the members of the Baidu Investor Class, as all members of the Baidu Investor Class are similarly affected by Defendants Morgan Stanley's and Goldman Sachs's wrongful conduct in violation of federal law, as complained of herein.

279.    Lead Plaintiff will fairly and adequately protect the interests of the members of the Baidu Investor Class and have retained counsel competent and experienced in class and securities

litigation. Lead Plaintiff has no interests antagonistic to or in conflict with those of the Baidu Investor Class.

280. Common questions of law and fact exist as to all members of the Baidu Investor Class and predominate over any questions solely affecting individual members of the Baidu Investor Class. Among the questions of law and fact common to the Baidu Investor Class are:

a. whether the federal securities laws were violated by Defendants Morgan Stanley's and Goldman Sachs's acts as alleged herein;

b. whether Archegos supplied MNPI to Defendants Morgan Stanley and Goldman Sachs, including information Defendants had a duty not to act on, and whether Defendants disregarded that duty and traded Baidu shares while in possession of MNPI concerning Baidu and/or Archegos;

c. whether the inside information was material; and

d. the amount by which Lead Plaintiff and other members of the Baidu Investor Class were damaged as compared to the amount Defendants Morgan Stanley and Goldman Sachs avoided losing as a result of the securities law violations alleged herein.

281. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages recoverable by individual Baidu Investor Class members may be relatively small, the expense and burden of individual litigation make it impractical for members of the Baidu Investor Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

282. Lead Plaintiff may rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

a.    Defendants Morgan Stanley and Goldman Sachs failed to disclose MNPI during the Class Period;

b.    the omissions were material;

c.    Baidu common stock is traded in an efficient market;

d.    Baidu shares were liquid and traded with moderate to heavy volume during the Class Period;

e.    Baidu shares were traded on the NYSE; and

f.    Lead Plaintiff and other members of the • Investor Class purchased, acquired, and/or sold the applicable Baidu securities between the time Defendants Morgan Stanley and Goldman Sachs failed to disclose material facts and traded thereon and the time the true facts were disclosed, without knowledge of the omitted facts.

283.    Based upon the foregoing, Lead Plaintiff and the members of the Baidu Investor Class are entitled to a presumption of reliance upon the integrity of the market.

284.    Additionally, Lead Plaintiff and the members of the Baidu Investor Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens v. U.S.*, 406 U.S. 128 (1972), as Defendants Morgan Stanley and Goldman Sachs breached a duty to disclose material information during the Baidu Class Period by trading while in possession of MNPI, as detailed above.

## CLAIMS FOR RELIEF

### FIRST CLAIM
### Violations of §10(b) of the Exchange Act and SEC Rule 10b-5
### (Against All Defendants)

285.    Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

286. This Claim is brought against all Defendants under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.

287. Defendants Goldman Sachs and Morgan Stanley obtained MNPI from Archegos, regarding, *inter alia*, Archegos's undisclosed controlling beneficial ownership positions across the Issuers, Archegos's likely insolvency as a result of its inability to satisfy its Prime Brokers' margin calls, and, therefore, the forthcoming liquidation of specific securities, including the Issuers' shares. In addition, the MNPI Defendants obtained from Archegos was, in each case, considered confidential by Archegos, which was the source of the MNPI, which provided the MNPI in breach of duties owed to the Issuers' and their shareholders, and which did not provide that MNPI to benefit the Issuers but rather to personally benefit itself, including but not limited to the pecuniary benefits Archegos realized by means of its market manipulation scheme and continuing that scheme, the relational and reputational benefits Archegos received or anticipated receiving in connection with the prime brokerage, block trading, margin lending, TRS and other exclusive services and markets it accessed by currying favor with Defendants and other Counterparties, and in connection with its efforts to delay default, increase its margin limits, and otherwise forestalling or delimiting the collapse of its market manipulation scheme across its positions in the Issuers.

288. Defendants Morgan Stanley and Goldman Sachs obtained the MNPI in connection with their prime brokerage, block trading, margin lending, and other confidential agreements with and services to Archegos. Defendants received substantial fees for those services, which facilitated Archegos's trading and market manipulation scheme.

289. Defendants Morgan Stanley or Goldman Sachs knew, recklessly disregarded, and should have known that Archegos constituted a statutory, temporary, or constructive insider of each of the Issuers by means of massive undisclosed beneficial ownership and other outsized

control over the outstanding share ownership of each Issuer, and thus that Defendants owed similar fiduciary and other duties to the corporations and shareholders of the Issuers, including to either disclose or abstain from trading on MNPI obtained from Archegos. Defendants also knew, recklessly disregarded or should have known that they owed a fiduciary duty, or obligation arising from a similar relationship of trust and confidence, to Archegos to keep the MNPI confidential and either disclose or abstain from trading on the MNPI.

290.   Nevertheless, while in possession of MNPI obtained from Archegos, and in breach of duties owed both to the Issuers and their shareholders, as well as to Archegos, Defendants Morgan Stanley and Goldman Sachs collectively sold billions of dollars' worth of the Issuers' shares, including their proprietary hedged shares, rushing to liquidate those shares before the market learned of that MNPI and of Archegos's impending collapse.

291.   Principally, Lead Plaintiff alleges that Defendants Morgan Stanley and Goldman Sachs are liable under a tipper/tippee theory for insider trading and front-running while in possession of MNPI obtained from Archegos in breach of duties Archegos owed directly (as a controlling shareholder of each Issuer) and that Defendants owed derivatively (as tippees of Archegos) to the shareholders of the Issuers. In the alternative, and only as specifically set forth above, Plaintiffs also allege that Defendants are liable under a misappropriation theory for insider trading and front-running while in possession of MNPI obtained in beach of duties of confidence owed to Archegos.

292.   By virtue of the foregoing, all Defendants, and each of them, in connection with the purchase or sale of securities, by the use of the means of instrumentalities of interstate commerce, or of the mails, or a facility of a national securities exchange, directly or indirectly:

a.      employed devices, schemes, or artifices to defraud;

b.    made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

c.    engaged in acts, practices, or courses of business that operated, or would have operated, as a fraud or deceit upon persons.

293.    By virtue of the foregoing, all Defendants, and each of them, directly or indirectly, violated, and unless enjoined, will again violate, §10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 thereunder, 17 C.F.R. §240.10b-5.

294.    Lead Plaintiff contemporaneously purchased and/or sold securities of the same classes as those in which Defendants Morgan Stanley and Goldman Sachs traded.  As alleged herein, by March 24, 2021, Defendants were already in possession of MNPI obtained from Archegos and had already begun surreptitiously to both sell off their proprietary hedged shares of the Issuers' stock and to tip off preferred hedge fund clients ahead of large sales and block sales in Issuer stock.

295.    The measure of damages for trading while in possession of MNPI information under Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and SEC Rule 10b-5, 17 C.F.R. §240.10b-5, is the disgorgement of profits gained and losses avoided by such trading.

296.    During the Class Period, Defendants Morgan Stanley and Goldman Sachs traded the Issuers' shares, and tipped off hedge fund clients who in turn traded the Issuers' shares, all while in possession of MNPI.  Defendants thereby avoided losses on such transactions in amounts estimated in the billions of dollars.  When the material adverse information and MNPI was eventually revealed, and as the undisclosed risk materialized, the Issuers' stock prices declined

and investors suffered economic loss. Lead Plaintiff and the other members of the Baidu Investor

Class are entitled to disgorgement of such amounts, together with prejudgment interest thereon.

297.    By virtue of the foregoing, Defendants Morgan Stanley or Goldman Sachs are

jointly and severally liable to Lead Plaintiff and the other members of the Baidu Investor Class

pursuant to Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5, 17 C.F.R.

§ 240.10b-5.

**SECOND CLAIM**
**Violations of §20A of the Exchange Act**
**(Against All Defendants)**

298.    Lead Plaintiff repeats and realleges each and every allegation contained above as if

fully set forth herein.

299.    This Claim is brought against all Defendants under §20A of the Exchange Act, 15

U.S.C. §78t-1.

300.    Defendants Morgan Stanley or Goldman Sachs knew, recklessly disregarded, and

should have known that Archegos constituted a statutory, temporary, or constructive insider of

each of the Issuers by means of massive undisclosed beneficial ownership and other outsized

control over the outstanding share ownership of each Issuer, and thus that Defendants owed similar

fiduciary and other duties to the corporations and shareholders of the Issuers, including to either

disclose or abstain from trading on MNPI obtained from Archegos. Defendants also knew,

recklessly disregarded or should have known that they owed a fiduciary duty, or obligation arising

from a similar relationship of trust and confidence, to Archegos to keep the MNPI confidential and

either disclose or abstain from trading on the MNPI.

301.    By virtue of the foregoing, all Defendants, and each of them, in connection with

the purchase or sale of securities, by the use of the means of instrumentalities of interstate

commerce, or of the mails, or a facility of a national securities exchange, directly or indirectly:

a.    employed devices, schemes, or artifices to defraud;

b.    made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

c.    engaged in acts, practices, or courses of business that operated, or would have operated, as a fraud or deceit upon persons.

302.    By virtue of the foregoing, all Defendants, and each of them, directly or indirectly, violated, and unless enjoined, will again violate, §10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 thereunder, 17 C.F.R. §240.10b-5.

303.    Lead Plaintiff contemporaneously purchased and/or sold securities of the same classes as those in which the Defendants Morgan Stanley and Goldman Sachs traded.  As alleged herein, by March 24, 2021, Defendants were already in possession of MNPI obtained from Archegos and had already begun to surreptitiously both sell off their proprietary hedged shares across the Issuers and tip off preferred hedge fund clients ahead of large sales in Issuer stock.

304.    When the material adverse information and MNPI was eventually revealed, and as the undisclosed risk materialized, the Issuers' stock prices declined and investors suffered economic loss, *i.e.,* damages.

305.    The measure of damages for trading while in possession of MNPI under Section 20A of the Exchange Act, 15 U.S.C. §78t-1, is the disgorgement of losses avoided by such trading.

306.    During the Class Period, Defendants Morgan Stanley or Goldman Sachs traded shares of the Issuers while in possession of MNPI and avoided losses on such transactions in amounts estimated at tens of millions of dollars.  Lead Plaintiff and the other members of the Baidu

Investor Class are entitled to disgorgement of such amounts, together with prejudgment interest thereon.

307.    By virtue of the foregoing, Defendants Morgan Stanley or Goldman Sachs are jointly and severally liable to Lead Plaintiff and the other members of the Baidu Investor Class pursuant to §20A of the Exchange Act, 15 U.S.C. §78t-1.

**THIRD CLAIM**
**Violations of §20(a) of the Exchange Act**
**(Against All Defendants)**

308.    Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

309.    This Claim is brought against all Defendants for control person liability under §20(a) of the Exchange Act.

310.    Defendants Morgan Stanley and Goldman Sachs controlled each of their employees who have been publicly named as swept up in the SEC and DOJ probe of block trading and the Morgan Stanley Fade misconduct alleged herein, including but not limited to: Pawan Passi, the long-time head of Defendant Morgan Stanley's block trading business, who was placed on leave in November 2021 amid regulatory investigations into his possible tipping of Defendant Morgan Stanley hedge fund clients — such as Surveyor Capital, Element Capital Management, CaaS Capital Management, Islet Management — ahead of Archegos-related block trades; Michael Daum, a partner at Goldman Sachs; Evan Damast, Morgan Stanley's global head of equity and fixed-income syndicate; John Paci, a senior equity trading executive at Morgan Stanley; and Charles Leisure, executive director on the Morgan Stanley syndicate desk. While Lead Plaintiff alleges that each of these employees were intimately involved in the illicit tipping of Defendants' hedge fund clients ahead of Archegos-related block trades, the precise scope and extent to which these

employees' actual misconduct in connection with the alleged trading and front-running will necessarily depend on fact-specific discovery unavailable to Lead Plaintiff at this stage.

311.    Pursuant to §20(a) of the Exchange Act:

Every person who, directly or indirectly, controls any person liable under any provisions of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable . . ., unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

312.    Defendants Morgan Stanley and Goldman Sachs did not act in good faith and directly and/or indirectly induced the wrongful acts complained of herein by:

a.    permitting the insider sales and tips to occur with actual knowledge or reckless disregard for whether the entities trading possessed MNPI; or

b.    failing to adequately supervise their own employees' actions in connection with the acquisition of the inside MNPI and trading and tipping thereon.

313.    By virtue of the foregoing, the Defendants Morgan Stanley or Goldman Sachs named in this count are jointly and severally liable, pursuant to §20(a) of the Exchange Act, to Lead Plaintiff and the other members of the Baidu Investor Class.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Lead Plaintiff demands judgment against Defendants Morgan Stanley and Goldman Sachs as follows:

A.    Declaring that the instant action may be maintained as a class action under Fed. R. Civ. P. 23 and certifying Lead Plaintiff as representative of the Baidu Investor Class;

B.    Requiring Defendants Morgan Stanley and Goldman Sachs to pay damages sustained by Lead Plaintiff and the other members of the Baidu Investor Class by reason of the act and transactions alleged herein;

C.      Ordering an accounting and disgorgement of the losses avoided by Defendants Morgan Stanley or Goldman Sachs by reason of the acts and transactions alleged herein;

D.      Awarding Lead Plaintiff and the other members of the Baidu Investor Class pre-judgment and post-judgment interest, as well as reasonable attorneys' fees, expert witness fees, and other costs and disbursements;

E.      Awarding Lead Plaintiff and the other members of the Baidu Investor Class such other and further relief as the Court may deem just and proper; and

F.      Awarding such other and further relief as this Court may deem just and proper.

## JURY TRIAL DEMANDED

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Lead Plaintiff hereby demands trial by jury of all issues that may be so tried.

DATED:  May 15, 2023         **HEDIN HALL LLP**

*/s/ David W. Hall* _____
David W. Hall (*pro hac vice*)
Armen Zohrabian (*pro hac vice* forthcoming)
Arun Ravindran (*pro hac vice* forthcoming)
Four Embarcadero Center, Suite 1400
San Francisco, CA  94104
Telephone: 415-766-3534
Facsimile:  415-402-0058
dhall@hedinhall.com
azohrabian@hedinhall.com
aravindran@hedinhall.com

*Lead Counsel for the Baidu Class & Co-Chair of the Executive Committee*

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**

Max R. Schwartz
Emilie B. Kokmanian
Marc Greco
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169

Telephone: 212-223-6444
Facsimile:  212-223-6334
mschwartz@scott-scott.com
mgreco@scott-scott.com
ekokmanian@scott-scott.com

*Lead Counsel for the IQIYI Class, Co-Lead Counsel for the
Discovery Class & Co-Chair of the Executive Committee*

**POMERANTZ LLP**
Jeremy A. Lieberman
J. Alexander Hood II
James M. LoPiano
Brian Calandra
600 Third Avenue, 20th Floor
New York, NY 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8655
jalieberman@pomlaw.com
ahood@pomlaw.com
jlopiano@pomlaw.com
bcalandra@pomlaw.com

*Lead Counsel for the ViacomCBS & Tencent
Classes & Executive Committee Member*

**BRONSTEIN, GEWIRTZ &
GROSSMAN, LLC**
Peretz Bronstein
60 East 42nd Street, Suite 4600
New York, New York 10165
Telephone: (212) 697-6484
Facsimile: (212) 697-7296
peretz@bgandg.com
*Additional Counsel for Named Plaintiff Kai Chen*

**THE SCHALL LAW FIRM**
Brian J. Schall
2049 Century Park East, Suite 2460
Los Angeles, CA 90067
Telephone: 310-301-3335
Facsimile:  213-519-5876
brian@schallfirm.com

*Executive Committee Member*

**BERGER MONTAGUE PC**
Michael Dell'Angelo
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (215) 875-3000
mdellangelo@bm.net

*Co-Lead Counsel for the Gaotu Class &*
*Executive Committee Member*

**JOHNSON FISTEL, LLP**
Ralph M. Stone
1700 Broadway, 41st Floor
New York, NY 10019
Telephone: (212) 292-5960
Facsimile: (212) 292-5680
RalphS@johnsonfistel.com

Michael I. Fistel, Jr. (*pro hac vice*)
40 Powder Springs Street
Marietta, GA 30064
Telephone: (470) 632-6000
Facsimile: (770) 200-3101
MichaelF@johnsonfistel.com

*Lead Counsel for the Vipshop Class & Executive Committee*
*Member*

**GRANT & EISENHOFER P.A.**
Jay W. Eisenhofer
Daniel L. Berger
Caitlin M. Moyna
485 Lexington Avenue
New York, NY 10017
Telephone: (646) 722-8500
Facsimile: (646) 722-8501
jeisenhofer@gelaw.com
dberger@gelaw.com
cmoyna@gelaw.com

*Co-Lead Counsel for the Discovery Class & Executive*
*Committee Member*

**ROSCA & SCARLATO LLC**
Alan L. Rosca (*pro hac vice*)
23250 Chagrin Boulevard, Suite 100

108

Beachwood, OH 44122
Telephone: (216) 570-0097
arosca@rscounsel.law

Paul Scarlato (*pro hac vice* forthcoming)
161 Washington Street, Suite 1025
Conshohocken, PA 19428
Telephone: 216-946-7070
pscarlato@rscounsel.law
*Co-Lead Counsel for the Gaotu Class*

**KIRBY McINERNEY LLP**
Ira M. Press
250 Park Avenue, Suite 820
New York, NY 10177
Telephone: 212-371-6600
ipress@kmllp.com

*Local Counsel for the Gaotu Class*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served by CM/ECF on

May 15, 2023, on all counsel or parties of record.  Notice of this filing will be sent to all counsel

of record by operation of the Court's electronic filing system.

*/s/ David W. Hall*
David W. Hall